RECEIVED

SEP 1 7 2013

BY MAIL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN    DIVISION

THOMAS P. LEBON #358989
)
TOMMY YARBERRY # 522773
)
)
JACOB MEEKS #1166377 *Paralegal*    )    CLASS ACTION LAWSUIT
)
(Enter above the full name of the    )
Plaintiff(s) in this action. Include prison    )
registration number(s).)    )
)
v.    )
MISSOURI STATE PUBLIC DEFENDER )    Case No. _____
)    (To be assigned by Clerk)
SYSTEM et, al,    )
)
CATHY R. KELLY-DIRECTOR    )    DEMAND JURY TRIAL
)
_____    )
)
_____    )
)
(Enter above the full name of **ALL** Defend-    )
ant(s) in this action. Fed. R. Civ. P. 10(a)    )
requires that the caption of the complaint    )
include the names of **all** the parties. Merely    )
listing one party and "et al." is insufficient.    )
Please attach additional sheets if necessary.    )

## PRISONER CIVIL RIGHTS COMPLAINT UNDER 42 U.S.C. § 1983

I.    PLACE OF PRESENT CONFINEMENT:

THOMAS P. LEBON AND ALL OTHER PLAINTIFFS, ARE LISTER ADDRESSED
ON SEPERATE PAPER.

II.    PREVIOUS CIVIL ACTIONS:

A.    Have you brought any other civil actions in state or federal court dealing with the
same facts involved in this action or otherwise relating to your confinement?

YES    [ ]    NO    [X]

18701 OLD HWY 66
PACIFIC, MO. 63069

ALEX BARRAGAN #1056744
H.U. #2-C-20
MECC
18701 OLD HWY 66
PACIFIC, MO. 63069

FRENCHIE BOND #1238512
H.U. #2-C-2
MECC
18701 OLD HWY 66
PACIFIC, MO. 63069

EARL    DIXION # 1005 703
H.U. # 2-C-1
MECC
18701 OLD HWY 66
PACIFIC, MO 63069

18701 OLD HWY 66
PACIFIC, MO. 63069

CARLETON J. SHERWOOD #1233166
H.U. #2-B-20
MECC
18701 Old HWY 66
PACIFIC, MO. 63069

SHEADRICK COLEMAN #1018600
H.U. #2-C-16
MECC
18701 OLD HWY 66
PACIFIC, MO. 63069

TYRONE BUCKLEY # 152968
H.U. 2-B-11
Mecc
Pacific mo. 63069

ADDITIONAL PLAINTIFFS IN CLASS ACTION LAWSUIT AGANIST THE DE-
FENDANTS:

JACOB MEEKS, 1166377
H.U. #2-C-6
MECC
18701 OLD HWY 66
PACIFIC, MO. 63069

STEPHEN D. GREEN #515546
H.U. #2-D-10
MECC
18701 OLD HWY 66
PACIFIC, MO. 63069

THOMAS PAUL LEBON #358989
H.U. #2-B-2
MECC
18701 Old HWY ⊄66
PACIFIC, MO. 63069

TOMMY YARBERRY #522773
H.U. #2-B-2
MECC
18701 OLD HWY  66
PACIFIC, MO. 63069

DAVID REED JR, #178262
H.U. #2-C-24
MECC
18701 OLD HWY 66
PACIFIC, MO. 63069

RAYMOND GLASS #149685
H.U. #2-C-14
MECC
18701 OLD HWY 66
PACIFIC, MO. 63069

CARLTON STRICKLAND #190776
H.U. #2-C-11
MECC
18701 OLD HWY 66
PACIFIC, Mo. 63069

CRAIG BECK # 1035895
H.U. #2-C-26
MECC
18701 OLD HWY 66
PACIFIC, MO. 63069

SCOTTY F. HOOE #2-C-5
H.U. #        1239697
MECC

RICKY D. JACKSON #1-D-9
H.U.        #46226
MECC

B.    If your answer to "A" is YES, describe the action(s) in the space below.  If there is more than one action, you must describe the additional action(s) on a separate piece of paper, using the same format as below.

1.    Parties to previous civil action:

Plaintiff(s):  **Printed on seperate paper in the allove.**

Defendant(s):  **CATHY R. KELLY (DIRECTOR) OF MISSOURI STATE PUBLIC DEFENDER SYSTEM:**

2.    Court where filed:  **WILL BE IN EASTER FEDERAL COURT**

3.    Docket or case number:  **NO FUTURE NUMBER HAVE BEEN GIVEN**

4.    Name of Judge:  **NO JUDGE AT THIS TIME:**

5.    Basic claim made:  **WILL BE MADE IN THE FUTURE, WITH THIS CLAIM.**

6.    Present disposition (Is the case still pending?  Is it closed?  If closed, was it appealed?):
       **NOT ANY AT THIS TIME**

III.    GRIEVANCE PROCEDURES:

A.    Is there a prisoner grievance procedure at the institution in which you are incarcerated?

YES   [  ]                    NO    [ X ]

B.    Have you presented this grievance system the facts which are at issue in this complaint?

YES   [  ]                    NO    [ X ]

C.  If your answer to "B" is YES, what steps did you take: _____

**This is not a grievance matter.**

_____

_____

D.  If your answer to "B" is NO, explain why you have not used the grievance system:

_____

_____

IV.  PARTIES TO THIS ACTION:

A.  Plaintiff(s)

1.  Name of Plaintiff: **ALL PLAINTIFFS, IN THIS CASE ARE ON SEPERATE PAPER.**

2.  Plaintiff's address: **PLESE SEE LISTED, ON S. PAPER:**

3.  Registration number: **ALL HAVE BEEN LISTED, ON S. PAPER**

4.  Additional Plaintiff(s) and address(es): **THE SAME ON ALL LISTED 18701 OLD HWY 66, PACIFIC, MO. 63069**

_____

B.  Defendant(s)

1.  Name of Defendant: **CATHY R. KELLY (DIRECTOR) M.S.P.D.**

2.  Defendant's address: **231 Capitol ave, Jefferson City, Mo. 65101**

3.  Defendant's employer and job title: **DIRECTOR-MISSOURI STATE PUBLIC DEFENDER SYSTEM**

4.  Additional Defendant(s) and address(es): **▓▓▓ AT THIS TIME. ELLEN BLAU-DIVISION DIRECTORS 1010 Market St. St. Louis Mo. 63101 KAREN KRAFT- DIVISION DIRECTORS 1010 Market St. St. Louis, mo. 63101**

-3-

V.    COUNSEL

A.    Do you have an attorney to represent you in this action?

YES   [  ]                    NO    [X]

B.    If your answer to "A" is NO, have you made an effort to contact an attorney to represent you in this matter?

YES   [  ]                    NO    [X]

C.    If your answer to "B" is YES, state the name(s) and address(es) of the attorneys you contacted and the results of those efforts:

No Attorney at the present time.

D.    If your answer to "B" is NO, explain why you have not made such efforts:

The Cost is to Great, and do not have the funds.

E.    Have you previously been represented by counsel in a civil action in this Court?

YES   [  ]                    NO    [X]

F.    If your answer to "E" is YES, state the attorney's name and address:

Not any;

-4-

VI.   Statement of claim (State as briefly as possible the facts of your case. Describe how each defendant is involved. You must state exactly what each defendant personally did, or failed to do, which resulted in harm to you. Include also the names of other persons involved, dates, and places. Be as specific as possible. State your claims in numbered paragraphs. You may use additional paper if necessary):

In Claim #1 The Plaintiff Jacob meeks will state the Following

below. On or about May 28, 2010, the was represented by the

Attorney Anthony Kagay, out of Clay County Circuit Court,

at Liberty Mo. In representing the Plaintiff, this Attorney

did nothing but try to get the plaintiff, to plead out to

the prosecution. The Plaintiff did every thing he knew to

do get this Counsel of his Case. (Case No. 10-CY-CR00948)

Mr. Anthony Kagay, did fall below Lines set by the (ABA)

his representation, as so outlined by "The Spangenberg Group"

The Court should note(TSG) will be used through out this

Claim, with others plaintiffs, as well. The T.S.G. who a did

complete study of these Attorneys, that worked in the

Missouri State Publis Defender System. The M.S.P.D.S.

has Cover this Information, for sometimes for the Client's

it's supposing to have represented. The Plaintiffs, belives

that Laws, have been violated, by (MSPDS) who knowingly did

not rpresent their Clients, by the Oath they have Taken.

This Fraud has caused many Clients (represented by MSPDS)

to plead out Charges brought about by Prosecutors, in these

continue on extra paper-please turn to the next page

different Counties. The Plaintiff case out of New Madrid County
August 10, 2006 (o6NM-CR-00294) Ms Susan Burns who represented
the Plaintiff, who made a statement and said "That the MSPDS is so
bad, that I am quitting this Post. The Above case is Pending in
the Federal Eastern District Court (In a Writ Of Habeas Corpus) to
this very day. The Plaintiff, will point out that the TSG who did
these studies of MSPDS was right on target, with this study. The
plaintiff (Jacob Meeks) have live in this awful situation. This is
why we are bringing this "SUIT" because they should have made it
very clear, the situation, that it was in. This MSPDS have caused
a Great Harm the Crimminal Justice System. This is the Reason for
this high level of turnover among staff attorneys created serious
problems at the MSPDS. This has caused serious harm to a lot of
defendants, including this Plaintiff. Many of these Attorneys was
so over burden, you could see it, in their representation. This is
the Reason, why don't any client believe that they are getting fair
representation with MSPDS.

**Claim #2 The Plaintiff Stephen D. Green.** out of STE. Genevieve
County had similar problems with MSPDS. The Plaintiff attorney
who worked for the MSPDS did not even bother to investigate his
claim wheather it was true, but gave alliance to the Prosecutor
of said County. The Problems with these Lawyers, they don't have
ant training how to deal with their clients. They think they just
tell you anything, and you supposed to believe them. Mr. Green
is fighting his case in The Federal Courts (Writ Od Habeas Corpus)
this day, because his attorney from MSPDS did not have time for
to seek out the Truth. All the **Plaintiffs, in this Claim have been
Mislead or just "Out Right Lied To", this behavior, has caused,
many Constitutionals Violation, of the rights of these Plaintiffs,
and So Many Others. Their 6th and 14th amend. rights is at risk.**
Please note in TSG where some Attorneys have Confessed that, they
have regrets the way they mislead their clients, even at the risk
of violating there "Attorney Clinet Priviledge" and in violation
of the ABA Standards. These Attorneys have numerious of Problems,
themselves, instead being Honest with their Clients, they put
on some Fashion Show, hope that the Client will fall victim. **The**

Plaintiffs in this Lawsuit will ask this Court, to make Part of
The Plaintiffs, Claim "THE SPANGENBERG GROUP", "The Center for
Justice, Law and Society at George Mason University.
These experience are real, and the plaintiffs, have dealt with these
Problems with several of these Attorneys.
The rest of the Plaintiffs, have Join with TSG to exercise their
right under the Constitution with, where Liberty and Justice for
all.
The Plaintiffs, 6th 14th amend Rights was Violated by the above
defendants, which has caused pain and suffering, to the degree that
it beyond any can imagine, could happen. These Attorneys, that has
represented Clients, has used all type of tricks, to get them to
"Plea Out" there Right's which was given to them under the Const.
The Lies and Decit by the MSPDS should be dealt with by this Court.

THIS IS NOT THE END OF THE PLAINTIBFS CLAIM, WHICH ONLY A PREVIEW
OF WHICH IS TO COME. THESE PLAINTIFFS HAVE A LOT MORE HORRIBLE AND
UNCONST. THINGS TO TO THIS COURT. MANY ARE SITTING IN PRISON BE-
BAUSE OF THIS EVIL ACT BY MISSOURI STATE PUBLIC DEFENDER SYSTEM.

VII.  RELIEF

State briefly and exactly what you want the Court to do for you.  Do not make legal arguments.  (Note: If you are a **state** prisoner and you seek from this Court relief that affects the length or duration of your imprisonment, your case **must** be filed on a § 2254 form.)

The Plaintiffs want this Court, to render Judgement on the

Defendants, for all the information obtain, and gather in the

above, and prays that this will grant the plaintiffs, ther

due justice, that should have lleen afforded, lly the defendants.

This Corruption, is still going in the system, as outline.

VIII.  MONEY DAMAGES:

A) Do you claim either actual or punitive monetary damages for the acts alleged in this complaint?

YES [X]          NO [ ]

B) If your answer to "A" is YES, state below the amount claimed and the reason or reasons you believe you are entitled to recover such money damages:

THE ABOVE PLAINTIFFS, IS SUING THE ABOVE DEFENDANTS, IN THE AMOUNT

OF ONE HUNDRED AND SEVENTY-FIVE MILLION ($175,000.000.00) DOLLARS

FOR THE PAIN AND SUFFERING, THAT THIS AGENCY HAVE DONE TO THE

PLAINTIFFS.

IX.  Do you claim that the wrongs alleged in the complaint are continuing to occur at the present time?

YES  [ X ]          NO  [  ]

_____
Signature of attorney or pro se Plaintiff(s)

9-16-2013
_____
Date

-6-

# Assessment of the Missouri State Public Defender System

**Final Report**

Prepared By:

**The Spangenberg Group**

and

**The Center for Justice, Law and Society at George Mason University**



October, 2009

Robert L. Spangenberg
David J. Newhouse
Jon B. Gould

*078*

TABLE OF CONTENTS

SECTION I. BACKGROUND ................................................................................1
   Overview of the Missouri Public Defender System: Clients & Cases.................1
   The Public Defender System in Missouri: 1989-2005...........................3
   Staffing........................................................................6
   Quality of Representation......................................................8
   Funding.........................................................................8
   Indigency Determinations.......................................................9
   Representation in Conflict Cases...............................................9
   Comparison with Ten Principles of a Public Defense Delivery System .........10
   Comparison with Other States..................................................11
   ABA Guidelines for Assessing & Addressing Excessive Caseloads...............12
SECTION II. MAJOR FINDINGS (2009) .................................................13
   A. State of MSPD's Operations.................................................14
   MSPD's Resource Crisis: A Decade of Underfunding.............................14
   MSPD's Caseload Crisis: Fundamental Obligations & Excessive Workloads.......16
   B. MSPD's Fifteen-Year Effort at Reform......................................32
   2002-2006: Efforts to Expose the Crisis Succeed as Efforts at Change Fail....33
   Notice to Legislature of Imminent Constitutional Crisis.....................35
   Notice to Courts of Inability to Accept Additional Appointments ............38
   The Caseload Crisis Time Study...............................................40
   Staffing Ratios..............................................................43
   Comparative Caseload Standards...............................................45
   C. Indigency Determinations..................................................53
   Statutes, Rules & Guidelines Relating to Indigency Determinations by MSPD ...54
   MSPD Indigency Determinations in Practice...................................56
SECTION III. ASSESSMENT OF FINDINGS IN LIGHT OF THE EIGHT GUIDELINES....................................................................60
SECTION IV. CONCLUSION...............................................................64
   Caseload Crisis..............................................................64
   The Tipping Point............................................................66

*079*

**"THE ATTORNEYS WHO WORK FOR MSPD DO NOT HAVE THE NECESSARY TOOLS, TIME AND STAFF TO DO THEIR JOBS . . . AND YET SOMEHOW, LIKE SISYPHUS, THEY ALL KEEP PUSHING THE BOULDER UP THE MOUNTAIN HOPING THAT IT DOESN'T CRUSH THEM AND THEIR CAREER THE NEXT TIME IT ROLLS BACK DOWN." - MSPD STAFF MEMBER**

## Section I. Background

*Overview of the Missouri Public Defender System: Clients & Cases*

The Missouri Public Defender System ("MSPD") is responsible for providing legal representation to all indigent citizens accused of or convicted of crimes in Missouri, as required by the Missouri Constitution as well as the United States Constitution.[1]

Pursuant to sections 600.086 and 600.042 of the Missouri Revised Statutes, public defenders provide legal services to individuals:[2] (1) detained or charged with a felony, including appeals from felony convictions; (2) detained or charged with a misdemeanor which "will probably result in confinement" upon conviction, including appeals from conviction in such cases; (3) detained or charged with violations of probation or parole; (4) who have been taken into custody pursuant to section 632.489, a statute authorizing civil commitment of sex offenders, including appeals from determinations pursuant to that statute; (5) for whom the federal or state constitution requires appointment of counsel; and (6) for whom, in a case in which he or she faces a loss or deprivation of liberty, any state law requires appointment of counsel.[3]

The agency structure is divided into three parts: the Trial Division, the Capital Division, and the Appellate/Post-Conviction Division. Attorneys in district offices within each division

---

[1] Contract attorneys may be utilized in cases where there is a conflict of interest between a defendant and the MSPD, or to address overload or staff shortages in particular offices to the extent possible.
[2] The statutes do not distinguish between juveniles and adults. As discussed in Section IIIC of this report, we are deeply concerned about the few juveniles represented by the MSPD. We have been unable to determine why this is the case, and we strongly urge that the issue receive further inquiry and attention.
[3] Section 600.042 specifically excludes representation by the Public Defender of individuals charged with violations of county or municipal ordinances.

1

provide direct representation to MSPD clients. Consistent with Chapter 600's representation requirements, a typical trial caseload of non-entry-level public defenders includes: homicides; A-B felonies; C-D felonies; misdemeanors; traffic cases; juvenile delinquency cases; and probation/parole violations.

The MSPD Mission Statement is unambiguous in its objectives:

> The mission of the Missouri State Public Defender System is to provide high quality, zealous advocacy for indigent people who are accused of crime in the State of Missouri.
> The lawyers, administrative staff, and support staff of the Public Defender System will ensure that this advocacy is not compromised.
> To provide this uncompromised advocacy, the Defender System will supply each client with a high-quality, competent, ardent defense team at every stage of the process in which public defenders are necessary.

Given that MSPD reports handling more than 85,000 cases each year, funding and staffing are critical to achieving those objectives. MSPD has roughly 560 employees, 350 of whom were attorneys. In addition to attorneys, MSPD employs paralegals, investigators and support staff. While there was no increase in staffing from 2003 to 2008, MSPD was provided with 12 new attorneys in 2009.

Though MSPD has endeavored to obtain additional funding to increase its staff for eight consecutive years, except for the attorney positions added in 2009, MSPD has had no additions to its staff, despite the fact that during the previous years (when there was no staff increase) the MSPD caseload increased by as many as 12,000 cases.

*The Evolution of the Missouri Public Defender System: The Early Years*

In 1963, the Supreme Court of the United States decided the landmark case of *Gideon v. Wainwright*, 372 U.S. 335 (1963), establishing that the Sixth Amendment to the United States Constitution guarantees the assistance of counsel to those unable to hire their own attorneys. In 1972, Missouri enacted Chapter 600, which established a Public Defender Commission,

2

responsible for the operation of a hybrid system of local public defender offices and appointed counsel programs. Five years later, in 1977, while eighteen of Missouri's 43 judicial circuits were serviced by public defender offices, the remaining twenty-five circuits were still forced to rely on an appointed counsel system, with judges assigning cases to members of the private bar. In 1982, the Office of the Missouri State Public Defender was established as an independent department within the judicial branch. At that time, some of the appointed counsel program was replaced with contract counsel; contract counsel were private attorneys who, rather than being assigned cases by a judge, agreed to take on all indigent clients in a particular area for a set fee. The contract counsel system proved remarkably problematic, not only because of rising costs, but also because private counsel were unwilling to take on a large number of cases for a set fee, in addition to (and in competition with) their paying cases.

In 1989, the contract counsel system was eliminated altogether and replaced with public defender offices, staffed with full-time public defenders, covering all counties in the state. A major structural reorganization of MSPD, designed to maximize both effectiveness and efficiency through specialization, resulted in the three legal services divisions identified above: Trial, Appellate/Post-Conviction, and Capital. The Trial Division was subdivided into thirty-six district offices, while the Appellate/Post-Conviction and Capital Division were each provided offices in Kansas City, St. Louis, and Columbia.

*The Public Defender System in Missouri: 1989-2005*

Approximately four years after the 1989 elimination of the contract system and establishment of a statewide system of full-time defenders, the Spangenberg Group (hereinafter "TSG")[4] was asked to conduct a study, under the auspices of the ABA Bar Information Program

---

[4] Historically, The Spangenberg Group has been a nationally and internationally recognized criminal justice research and consulting firm that specializes in indigent defense services. TSG has conducted research in all 50 states and provided consultative services to developing and developed countries that are reforming their legal aid delivery programs. TSG has conducted comprehensive statewide studies of

3

---

(hereinafter "ABA-BIP") of the State Public Defender System for the Missouri State Public Defender and its Commission. The 1993 study focused on the operation of the Public Defender System, the internal allocation of resources, and the overall budgeting and staffing situation, in addition to providing information about Missouri's relative position with other states in terms of caseload and funding of statewide programs. During the course of the study, TSG conducted site work in Columbia, Jefferson City, St. Louis, Clayton, and Kansas City. As far back as 1993, it was clear that MSPD was experiencing great difficulty, which resulted in the following conclusions:

> [T]he increased caseload and the low salaries have led to a high turnover of staff over the last two years and several additional experienced attorneys indicated that they may also leave. The effect of the workload, the low salary and the turnover has not surprisingly resulted in morale problems in some offices. Many attorneys feel that without additional resources, they will not be able to provide competent representation to all of their clients. We echo this sentiment in very strong terms.

1993 Report at 5.

In March of 2005, over a decade after the completion of the initial study, TSG was informed that the Director of the Office of the Missouri State Public Defender, J. Marty Robinson, had contacted the Missouri Bar concerning what he perceived to be a crisis situation within the program. The ensuing discussions resulted in an effort by the Missouri Bar to urge its members across the state to sign up to accept public defender appointments on a pro bono basis because of a serious case overload within the Public Defender System.

The incoming president of the Missouri Bar, Douglas A. Copeland, subsequently agreed to appoint a Public Defender Task Force charged with working with the Public Defender Commission, the bench, and the bar to identify and solve short and long-term needs related to the

---

indigent defense systems in more than half of the states, and has worked with many jurisdictions to develop public defender systems. In February of 2009, TSG joined George Mason University to form the Spangenberg Project (hereinafter "TSP"). Although George Mason researchers assisted with the interim report and this report, TSG is listed as the author since its researchers conducted much of the preliminary analysis.

4

---

defense of indigent criminal defendants. The Public Defender Task Force was appointed by Mr. Copeland and met in St. Louis for the first time in July of 2005. Robert Spangenberg also met with the Task Force at this time. One of the initial determinations of the Task Force was to contract with TSG to conduct a limited assessment of the Missouri Public Defender System and to report to the Task Force prior to October 15, 2005.

The focus of the 2005 study was the operation of the Public Defender System, overall budgeting, staffing, allocation of resources, caseloads and Missouri's standing relative to other comparable states. During the week of August 29, 2005, Robert Spangenberg, along with a senior research associate, visited nine Public Defender Districts across the state: District 19 (Jefferson City, Administrative Office); District 13 (Columbia); District 7 (Liberty); District 6 (Kansas City Juvenile); District 16 (Kansas City Trial); District 21 (St. Louis County); District 22 (St. Louis City); District 24 (Farmington); and District 25 (Rolla). During the visits, District Defenders, Assistant Public Defenders, staff investigators, paralegals, clerical staff, judges, prosecutors, private attorneys, and other individuals responsible for participating in the state's criminal justice system were interviewed. Two Public Defender Commission members, the State Public Defender, the Trial Division Director, the Deputy Trial Director, the Appellate Division Director and the Capital Division Director were also interviewed. Court observation was conducted as well.

TSG also reviewed an extensive amount of cost and caseload data provided by the Public Defender, along with other written material including memoranda, Missouri case law, Missouri Supreme Court Rules of Professional Conduct, Public Defender Guidelines, pleadings and exhibits filed by the Public Defender in St. Louis City litigation, and other documents provided during the site visits. In light of this work, TSG's prior experience in Missouri (and further informed by TSG's work in a number of other states), as well as the initial meeting with the

5

---

Missouri Bar Public Defender Task Force in July, TSG provided the Task Force with initial findings on September 27, 2005.

TSG's 2005 findings were dire, concluding that the Missouri Public Defender System was struggling to survive. Areas of particular concern included continuous turnover of staff, loss of experienced attorneys, extremely low salaries (with little hope of increase or advancement after several years), low morale, and a real perception of case overload. More broadly, TSG concluded that there was reason to believe that some public defender attorneys were not complying with either the Public Defender Guidelines for Representation or the Missouri Supreme Court Rules of Professional Conduct. Of even greater concern were indicators that the performance of some public defenders was falling below the constitutional minimum, signaling that attorneys were failing to provide the effective assistance of counsel to their clients and violating Missouri's Rules of Professional Conduct.

We should note that, in 2005, we were very impressed with the quality and commitment of most of the staff. Despite working under severe conditions, MSPD staff demonstrated a continuing commitment to clients, making great efforts to do the very best with the resources available.

TSG's 2005 study resulted in a number of conclusions, including, *inter alia*, the following abbreviated findings:

*Staffing*

An extremely high level of turnover among staff attorneys created serious problems at the Public Defender. With many experienced attorneys leaving, cases were being distributed among either a small number of remaining experienced attorneys or to new attorneys who were not yet ready for either a significant caseload or serious felony cases. The turnover problem was causing the remaining staff to shoulder the burden, contributing to a sense of overload and burnout. In addition, the turnover problem was creating a serious risk that newly-assigned attorneys would

6

be unprepared or inexperienced. Judges in some areas expressed a real concern over the experience of the public defenders handling serious cases. Some judges also noted that attorneys were not getting needed trial experience as few cases were being tried. Recruitment and retention proved especially challenging in the rural offices where few attorneys wished to be placed. In the Farmington office, at least three attorneys were commuting from St. Louis, a distance of approximately 70 miles. Between FY 2001 and FY 2005, the Public Defender experienced a cumulative attorney turnover rate of approximately 100%. High turnover also resulted in limited supervision, since most supervisors and district defenders were consumed with the burdens of their own ever-increasing caseloads.

The turnover problem was made worse by the fact that there appeared to be little hands-on supervision of the staff attorneys, particularly the new attorneys. Supervision was very limited because most supervisors were carrying their own heavy caseloads.

Public Defender salaries were far too low and were a major cause of the high turnover, low morale, and recruitment difficulties of the Public Defender System. There were no raises in FY 2002 or FY 2003. In FY 2004, staff earning less than $40,000 received a raise of $600. In FY 2005, all staff except the State Public Defender received a raise of $1,200. Salaries started at $33,792 and were capped at $52,452 for all trial attorneys so that attorneys had no financial incentive to stay long-term. The salary of $52,452 for the most experienced trial attorneys (APD IV's) was the lowest that TSG had encountered in the country. Some staff, including attorneys, had second jobs, which was both demoralizing and an additional source of stress. Recent law school graduates, moreover, were entering the practice with increasing amounts of law school debt (e.g., $50,000 - $100,000), making the low salaries an even greater hindrance to attorney recruitment and an even greater cause of stress and frustration for new public defenders. Because of the low public defender salaries, some offices were losing public defenders to the prosecutor's office.

7

*Indigency Determinations*

In 2005, TSG concluded that there were substantial problems with indigency determinations, noting in particular the "presumption" that a defendant was ineligible for MSPD services if the defendant had been released on a bail of $5,000 or more.[8] TSG observed that some public defenders would find a defendant ineligible if such a bond had been made, without regard to other factors, such as whether a small percentage of the bail was paid to a bondsman or whether a friend or family member posted the bond but could not also afford to hire counsel. TSG found this practice to be problematic, as well as unsupported by the statute or the guidelines. TSG reasoned that using public defenders to make indigency determinations regarding prospective clients created at the very least an appearance of a conflict of interest, given that public defenders had an incentive to not find a person indigent, since their caseloads were already too high. In line with that analysis, TSG found that many public defenders were quick to find a defendant ineligible for counsel if, for example, they had posted a bond. In addition, valuable attorney time had to be spent interviewing potential clients regarding indigency and making eligibility determinations.

*Representation in Conflict Cases*

In 2005, TSG was concerned about the handling of conflict cases by the Public Defender, a concern which echoed its initial concern in 1993. There was no written policy setting forth the definition of a conflict or the policies and procedures for assigning conflict cases out to the private bar. Each attorney was told only to be guided by the Rules of Professional Conduct, and there appeared to be no review of the staff attorneys' determinations of conflict.

Many conflict cases were referred within the Public Defender program to other regional offices. TSG noted that it knew of only one other public defender program in the country that did not use the private bar for conflict cases. TSG concluded that public defender handling of

---

[8] 18 CSR 10-3.010(2)(B)(2) (2005).

9

*Quality of Representation*

The combination of oppressive caseloads and turnover led some public defenders to describe their practice as "triage." Public defenders were forced to choose between providing adequate assistance to some clients and neglecting others. Work on some cases would not begin until the trial date was near. The Public Defender Deputy Director went so far as to describe the system as follows: "The present M.A.S.H. style operating procedure requires public defenders to divvy effective legal assistance to a narrowing group of clients."[4] He expressed his concern that, "[f]or individual public defenders to be forced to choose among clients as to who will receive effective legal assistance undermines professionalism and commitment."[5] Similarly, a District Defender stated that the volume of cases was so high that some public defenders could not provide effective assistance of counsel to many clients. TSG's 2005 findings reported serious problems with client contact, including lack of communication as well as communication in situations which jeopardized the attorney-client privilege, and continuity of representation.

*Funding*

In 2005, the Missouri State Public Defender had gone through several budget cycles without an increase in full-time equivalent (hereinafter "FTE") positions. The state had provided a total of 563 FTE Public Defender positions which broke down as follows: 342.5 attorneys; 73 paralegal investigators; 81.25 clerks or secretaries; and 62.75 legal assistants and other non-lawyer positions.[7] There was also a substantial lack of non-attorney support staff.

---

[4]  Dan Gralicke, "Living Double in a World of Trouble—The Indigent Criminal Defense Crisis in Missouri," *The Missouri Bar Weekly* at 3 (June 2005).

[5]  *Id.* at 2.

[7]  While this was the authorized staffing level, due to the substantial turnover rate and other personnel reasons, the positions were never completely filled at any given time. Staffing data source: Public Defender, Staffing of Local Offices - June 23, 2003.

8

conflict cases, including co-defendants, created an appearance of a conflict in the same manner that attorneys from the same law firm handling conflict cases would create such an appearance.

TSG also noted that conflict cases were taking too long to transfer from the originating office to the conflict office. In 2003, conflict cases took an average of 55 days from initial assignment to "disposition" or transfer from the originating office. In 2005, while the average time for a conflict transfer to another MSPD office was down to 43 days, it was still too long for a case to reach a conflict attorney.[9] Cases were also taking too long to transfer for assignment to private counsel out of the office. In 2003, it took an average of 70 days to transfer a case for assignment to private counsel; in 2005, it took 101 days.[10]

*Comparison with Ten Principles of a Public Defense Delivery System*

In 2002, the American Bar Association issued "The Ten Principles of a Public Defense Delivery System" (hereinafter "Ten Principles"). These principles have been generally accepted and used as guidelines to assess indigent defense systems across the country. TSG's 2005 study concluded that the Missouri State Public Defender system failed to meet a majority of those requirements. Specifically, as of 2005, the system failed to meet the following seven principles:

- Principle 2 – Where caseload is sufficiently high, the public defense delivery system consists of both a defender office and the active participation of the private bar.

- Principle 4 – Defense counsel is provided sufficient time and a confidential space with which to meet with the client.

- Principle 5 – Defense counsel's workload is controlled to permit the rendering of quality representation.

---

[9]  TSG also noted that the transfer of conflict cases to other Public Defender regional offices reduced the amount of time that a staff attorney could devote to his/her clients in their primary office. He/she might need a half-day or longer to attend a distant court or visit the conflict client in a distant jail. Further, TSG observed that conflict attorneys had no office in the conflict county and might not be familiar with the judges and practice there.

[10]  Our understanding is that, as of 2009, the situation regarding representation in conflict cases has not changed substantially.

10

- Principle 6 -- Defense counsel's ability, training, and experience match the complexity of the case.
- Principle 7 -- The same attorney continuously represents the client until completion of the case.
- Principle 8 -- There is parity between defense counsel and the prosecution with respect to resources and defense counsel is included as an equal partner in the justice system.
- Principle 10 -- Defense counsel is supervised and systematically reviewed for quality and efficiency according to nationally and locally adopted standards.

TSG further concluded that under 2005 conditions, some public defender attorneys were faced with violating both the Missouri Rules of Professional Conduct and Public Defender Guidelines for Representation each day.

*Comparison with Other States*

In 2005, TSG concluded that Missouri's indigent defense expenditures compared poorly in comparison to other southern states and the country as a whole.  No other statewide indigent defense program had failed to receive any additional appropriations in the previous five fiscal years.  In addition, TSG concluded that: (1) Missouri had the lowest per-capita annual indigent defense expenditure of all the southern states (except Mississippi, where data were not available); (2) Missouri had the lowest per capita expenditure of all statewide public defender systems; (3) Missouri had the lowest Attorney Unit Cost[11] of any jurisdiction in TSG's recent experience; (4) in order to reach the average per capita expenditure for all southern states, Missouri would need an additional appropriation of almost $16 million;[12] and (5) between 1993

---

[11]   Attorney Unit Cost is the total cost of supporting a single FTE attorney, including salary, benefits, support staff, administration and other overhead.

[12]   Based on preliminary data from 2008, that figure would now be $25 million, nearly $9 million more than that in 2005.

11

090

---

overburdened by excessive caseloads, urging the management of public defense programs to assess whether excessive workloads are preventing their lawyers from fulfilling performance obligations.  Guidelines 2, 3, and 4 relate to the need for continuous supervision and monitoring of workloads, as well as the concurrent need for management to determine if excessive workloads exist.  Guidelines 5 through 8 address a range of options that public defense providers and their lawyers should consider when excessive workloads are present.  In sum, Guidelines 1 through 4 explain the steps that may be pursued in order to assess the problem while Guidelines 5 through 8 propose ways to address the problem and effect change.

In addition to the structural deficiencies identified in the 2005 Findings (including, *inter alia*, appropriations and staffing), this Report considers both the indicators of a caseload crisis, in terms of failures to meet fundamental obligations consistent with Guideline 1, as well as MSPD's decade-long struggle for change, consistent with Guidelines 2-8.  The Eight Guidelines point to a growing crisis of constitutional magnitude, which despite MSPD's longstanding, systematic efforts, has been permitted to worsen, placing indigents persons accused of crimes, victims of crime, and the larger system of criminal justice in great peril.

**Section II.  Major Findings (2009)**

In 2008, TSG was retained by the Missouri Bar Association to evaluate the Missouri state public defender system.  That analysis had two parts – an interim report produced in March of 2009 that reviewed the MSPD's procedures and data collected from its internal case weighting study, and this final report.

As part of the entire project, TSG conducted site visits of MSPD offices throughout the state; performed focus groups of MSPD attorneys; met with MSPD and bar leaders; interviewed prosecutors; and considered relevant findings from other states.  In this respect, TSG employed a systematic research methodology, ensuring that those interviewed represented an appropriate cross-section of MSPD offices and levels of experience.  For example, the focus groups were

13

092

---

and 2005, Missouri appeared to have fallen from 42nd to 47th in the nation in per capita expenditure.[13]

As of 2008, based upon preliminary data from the 50 states, Missouri now has the lowest per-capita expenditures of *all* states, except for Mississippi.

*ABA Guidelines for Assessing & Addressing Excessive Caseloads*

In August 2009 the ABA issued for the first time "Eight Guidelines of Public Defense Related to Excessive Workloads" (hereinafter "Eight Guidelines").[14]  This landmark document was created in recognition of the fact that quality of defense services for persons charged in criminal and juvenile delinquency matters "is not achievable" when the lawyers providing the defense representation have too many cases.  In establishing these Guidelines, the ABA relied on a 2006 ethics opinion issued by the ABA Standing Committee on Ethics and Professional Responsibility.  That opinion, "its first ever ethics opinion concerning the obligations of lawyers, burdened with excessive caseloads, who provide indigent defense representation," made clear that all lawyers have a duty to furnish competent and diligent service, with no exceptions.  Eight Guidelines at 2 (citing ABA Committee On Ethics and Professional Responsibility, Formal Opinion 06-441 (2006)).

The Eight Guidelines recognized that, while the ethics opinion had set forth some steps to be taken when faced with excessive caseloads, neither that opinion nor the ABA Standards for Criminal Justice contained a "detailed action plan" as to how to proceed.  The Eight Guidelines then, did just that.  The First Guideline identifies certain fundamental obligations that defense lawyers have to their clients, irrespective of indigency, and notes that when lawyers fail to comply with these obligations "it is frequently because they have excessive caseloads."  Eight Guidelines at 6.  In other words, the First Guideline identifies the symptoms of a system

---

[13]   Based on preliminary data, Missouri's per capita expenditure in 2008 was $5.85.  This compares to expenditures of $9.02 in Kentucky, $9.19 in Arkansas, and $10.29 in Louisiana.

[14]   http://www.abanet.org/legalservices/sclaid/defender/downloads/eight_guidelines_of_public_defense.pdf

12

091

---

attended by 24 attorneys from 16 MSPD offices.  Upon the completion of its research, TSG shared its findings with the MSPD and solicited feedback to correct any known errors in the results.  The conclusions in this report, however, are entirely those of TSG.

**A.   STATE OF MSPD'S OPERATIONS**

*MSPD's Resource Crisis: A Decade of Underfunding*

- Appropriations

Over the past decade, increases to MSPD appropriations have averaged 2.7 percent per year.  This includes a $1.15 million dollar increase in 2007 to help pay for contract counsel.



- Attorney Turnover & Salaries

For approximately seven years (2000-2007), annual attorney turnover averaged over 18%, with some positions having turned over time after time after time.  We were repeatedly advised that turnover has improved significantly, if temporarily, because of the dismal state of the economy and the lack of a meaningful job market.  However, this information was almost always accompanied by the caveat that *if* people could leave for better pay, they would—and quickly.

14

093

Our June 2009 site visits confirmed that, particularly for attorneys at the lower and mid-levels of the pay scale, who also face staggering law school debt, present salaries simply are not high enough to cover all expenses. In addition to the pizza delivery, retail, bartending and truck driving that the Public Defender has previously reported, the site visit revealed other jobs maintained by full-time attorneys. One attorney, who expressed a great deal of dedication to her clients, explained that she nevertheless maintains two other positions which she works at night: babysitter and pizza parlor waitress. Another attorney explained that he lives in his grandmother's basement because he cannot afford to rent an apartment. Nor was the perceived need for additional sources of income limited to attorneys; support staff also reported supplemental employment, for example, selling beer at sporting events.

- Analysis of the Number of Full-Time Equivalent Staff at All Levels

Before the staff attorney additions in July of 2009, there had been no increase in the number of FTE's for six years, though MSPD's caseload had risen by over 12,000 cases. 2008 Fiscal Report at 7.



As of 2009, the staff to attorney ratio is as follows:

- 1 investigator to every 6.7 attorneys
- 1 secretary to every 5 attorneys
- 1 legal assistant to every 10.84 attorneys
- 1 paralegal to every 67 attorneys

*MSPD's Caseload Crisis: Fundamental Obligations & Excessive Workloads*

Perhaps the most significant findings come under the category of excessive workloads, where it appeared that far from improving since 2005, the situation has become more severe. Interviews with public defenders revealed a growing sense of frustration, at times desperation, at the sheer volume of cases they are asked to handle. One arguable improvement from 2005, a decrease in the astonishing attorney turnover rate (due to present economic conditions), appeared to have a negative side effect. It was reported to us that many disgruntled lawyers stayed on essentially against their will. Several attorneys conveyed a sense that, in this economy, some

attorneys feel that they have no alternative but to stay, and that they are effectively trapped. Rather than leaving, many attorneys are effectively biding their time until another opportunity presents itself.

Across the board attorneys explained, often with some measure of embarrassment and shame, that they were failing to discharge the kinds of fundamental obligations described by the ABA in its Eight Guidelines. Without exception, attorneys attributed these failures to an impossible volume of cases.

> When defense lawyers fail to discharge the kinds of fundamental obligations contained in this Guideline, it is frequently because they have excessive workloads. For example, the failure of lawyers to interview clients thoroughly soon after representation begins and in advance of court proceedings, as necessary, is often due to excessive workloads. When Public Defense Providers rely upon "horizontal" systems of representation, in which multiple lawyers represent the client at different stages of the case, and lawyers often stand in for one another at court proceedings, it is usually because there are too many cases for which the Provider is responsible. If written motions are not filed, legal research not conducted, and legal memoranda not filed with the court, the lawyers most likely have an excessive workload. Similarly, excessive workloads may be the reason that crime scenes are not visited in cases where it might be useful to do so. [T]here are other indicia of excessive workloads[.]

Eight Guidelines at 6. These attorneys painted the picture of a system in mounting crisis, where attorneys simply do not know how to manage.

At the outset of these findings we begin where the ABA began, examining sample fundamental obligations laid out in its first Guideline:

- Whether sufficient time is devoted to interviewing and counseling clients;
- Whether prompt interviews are conducted of detained clients and of those who are released from custody;
- Whether pre-trial release of incarcerated clients is sought;
- Whether representation is continuously provided by the same lawyer from initial court appearance through trial, sentencing or dismissal;
- Whether necessary investigations are conducted;

- Whether formal and informal discovery from the prosecution is pursued;
- Whether sufficient legal research is under taken;
- Whether sufficient preparations are made for pre-trial hearings and trials; and
- Whether sufficient preparations are made for hearings at which clients are sentenced.

The findings as to excessive workloads, however, do not end there. In Missouri, in 2009, we found that attorneys were not only failing to comply with these obligations, but also fundamental obligations beyond those listed in the Eight Guidelines.

- Sufficiency of Time to Interview and Counsel Clients

Attorneys from across the state reported that the inability to adequately communicate with and counsel one's clients may be the single most problematic consequence of excessive caseloads. One lawyer explained that her time is so incredibly limited that she finds it hard to get to see her clients, even though the jail is in the same building as her office. Other attorneys communicated their sense that they are so busy trying to do the bare minimum when it comes to legal work—retrieving discovery, filing motions, and the like—that meeting with clients tends to get pushed to the bottom of the list.

This only leads to more problems, because when attorneys finally make it out to see their clients, clients express frustration that they have been ignored, skepticism that the lawyer has been doing anything with the time, and a general lack of trust in the attorney. As one attorney put it, what it would take to improve that trust relationship is more time spent counseling, but of course, the lack of sufficient time is what led to this situation in the first place, so the relationship is unlikely to be healed.

- Prompt Interviews of Detained & Released Clients

Lawyers repeatedly told us that the PD Guidelines and Recommendations are simply not followed. As one lawyer put it, there simply is not enough time in the day or enough staff to

think about the Guidelines. In terms of prompt interviews with detained and released clients, as mentioned above, lawyers expressed grave concerns about their inability to meet with clients. We were told of a case where an attorney mistakenly believed a client had been released from jail, and did not find out until trying to reach that client at home (weeks, perhaps even months, later), that the client had been detained all along; the client's mother had to inform the lawyer that the client had never been home but had called several times from jail asking whether a lawyer was ever going to make it out to visit. The attorney said that, despite "feel[ing] miserable about this," the most concerning part of the story was that it could happen again, "given the workload" and how little time attorneys have to keep track of their clients and the infrequency with which they are able to speak with clients, whether detained or released.

- Efforts to Secure Pretrial Release

    Bond and detention were described to us by several lawyers as predetermined by the nature of the case and the resources of the client. Misdemeanants are typically released while individuals charged with felonies, particularly serious felonies, are detained. Several attorneys estimated that the initial client interview takes less than five minutes, thus making it impossible to gather the kind of information critical to any meaningful release determination.

- Consistency of Representation by Same Counsel

    Most performance standards, including those adopted by the National Legal Aid and Defender Association, call for vertical representation, namely that one public defender handle the case of an indigent defendant from first appearance to final disposition. There is legitimate discussion surrounding the question of whether or not horizontal representation can be provided at first appearance assuming there are a large number of defendants in the court. Many public defenders have vertical representation after the first appearance in order to take advantage of the number of cases that can be handled by one public defender, for example, the duty attorney.

19

098

It was reported that some MSPD offices engage in primarily vertical representation, while others utilize horizontal or partially horizontal representation. Some attorneys for instance, indicated that vertical representation "is present in the major felony cases, otherwise not." Another attorney reported that, except in homicides, they "do not have vertical representation and not doing so creates so many issues such as client trust, and the quality of work involved." Still another noted that "a lack of vertical representation is a big problem because it hurts the representation." In some smaller offices, there is vertical representation in virtually every case because, as one attorney explained, "with 7 attorneys, it wouldn't work any other way here."

    Attorneys in St. Louis County explained that they have a partially horizontal system, where one attorney handles the initial client interview and arraignment, after which another attorney is assigned for the merits phase of the case. One attorney expressed concern with this system, noting that "there are cases where it would be better to be there from beginning to end for trust" and that "overall it would be better to be there from day one to spot issues with the client." Another attorney explained that when clients pass from one attorney to the next, "clients get angry because they think they are getting passed through the system so then the attorney has to spend a lot of time getting the trust of the client." Substantively speaking, the lawyer reported that, "If attorneys represented clients from beginning to end some discoverable issues would have come to light. Because you can't spend a lot of time on facts and substance, some of the information is gone and witnesses have disappeared."

    Due in large part to MSPD's staggering rates of attorney turnover, it has been reported that one of the great dilemmas of the system is how to maintain consistent representation. In fact, we learned in our June 2009 visit that thanks to a court decision resulting from a *pro se* filing by an inmate represented by MSPD—whose trial had been continued multiple times due to each of his lawyers leaving the office—inmates represented by MSPD now routinely file such

20

099

*pro se* motions in order to ensure that their speedy trial rights are not jeopardized by the complete lack of consistency in their representation.

    In *State ex rel. McKee v. Riley*, 240 S.W. 3d 720 (Mo. 2007), a defendant charged with several counts of tampering with motor vehicles was detained for approximately a year and a half, with his case continued five times. Though he was represented by the public defender, he repeatedly filed speedy trial motions, *pro se*, as his case was continued again and again. The Supreme Court, sitting en banc, in an opinion authored by Chief Justice Stith, directed the trial court to immediately convene a hearing to determine whether the defendant's speedy trial rights had been violated, and if so, to dismiss the charges. It noted, moreover, that:

> In considering how to weigh any delay caused by crowded dockets, this Court and Respondents must take into consideration that the delay in this case is not unique. Numerous other petitions for writs have been filed in this Court by persons incarcerated while awaiting disposition of their charges in this and on some occasions in other jurisdictions, similarly alleging lengthy delays. The right to a speedy trial is an important right that the courts of this state are duty-bound to honor, even in the face of heavy trial dockets and competing demands for trial. Protracted and unreasonable delays in criminal cases due to crowded dockets cannot become routine. Neither is it acceptable for the prosecuting attorney and defense counsel to accept or request such routine continuances without objection. The defendant's right to a speedy trial and the public's interest in timely resolution of criminal cases demands that this and other similar cases receive more expeditious treatment, even in the face of competing demands on counsels' and the court's time.
>
> This Court does not mean to suggest that any party to this proceeding has intended to violate any defendant's speedy trial rights, but "unreasonable delay in run-of-the-mill criminal cases cannot be justified by simply asserting that the public resources provided by the State's criminal-justice system are limited and that each case must await its turn." [The defendant] is entitled to a prompt hearing on his claim that his constitutional rights have been violated and, if they have not yet been, then he is entitled to a prompt trial on the merits of these charges.

*Id.* at 731-32 (citations omitted).

- Completion of Necessary Investigation

21

10⌐

    Attorneys reported that investigation, oftentimes the most critical piece of effective criminal defense representation, has suffered tremendously as a result of the case overload. An investigator explained that misdemeanors, except in truly unusual circumstances, simply are not investigated. In fact, he explained that most of his investigation is devoted to "serious" felonies, particularly aggravated sex offenses, which take a substantial amount of time. Lesser felonies, like misdemeanors, are put at the bottom of the list and only investigated *if* the serious investigations are completed. The investigator reported that he is forced to spend two days out of the week doing bond interviews, which "is probably a waste of [his] time." Rather than going to interview witnesses in person, investigators tend to conduct phone interviews and do not typically take written statements.

    It was reported to us that MSPD investigators lack formal training that they at one time routinely received. For instance, one investigator explained that previously MSPD investigators were members of a national investigation society. They would also attend a national convention with formal training. He reported that these professional training opportunities were cut five years ago. Now, according to the staff investigator, training is "just individual," in other words, when a more senior investigator can find time to explain an investigative technique to a junior investigator. Salaries for investigators, moreover, cannot be said to compensate for the lack of training and professional development. Despite working for MSPD since 1995, we were told that one senior investigator still earns less than forty thousand dollars a year.

    Another investigator reported that attorneys almost never participate in investigation. Like the attorneys, however, the sheer volume of cases he is asked to handle makes it impossible for him to do what he needs to do, particularly in terms of locating essential witnesses, which can be time-consuming. Lawyers themselves also reported that the MSPD fails to complete satisfactory investigation in many cases. Explanations for the failure to investigate, by lawyers

22

101

from around the state, mirrored discussions of client counseling, where as they saw it, they were forced to spend the precious hours available to them doing the legal work that only a lawyer could, which for the most part amounted to court appearances and the drafting of pleadings. Lawyers recognize, however, that investigators are "just as overloaded as the attorneys are" and "are often too busy" to accomplish what is necessary.

A rush to accept guilty pleas was also reported as a reason for cutting short investigation. Several lawyers explained that when a client wishes to plead guilty, attorneys often jump at the chance, and investigation—to the extent that it has begun at all—ceases. As one lawyer put it, if a client indicates a desire to plead guilty, "we don't fight it because we have too much work to do," and so "we don't look into the case as we should" and instead the pleas goes forward. This is particularly true in misdemeanor cases, where we were told there is the highest rate of "meet and plead," making any kind of independent investigation impossible. Some attorneys noted that, as with legal research that is not completed, were there more time for investigation, there are many cases where one would discover compelling reasons to go to trial. Due to the crushing caseload, however, neither the research nor the investigation gets done, and clients likely plead guilty in cases where, provided adequate representation, they might well have prevailed.

- Pursuit of Formal and Informal Discovery

According to the prosecutors we interviewed, they provide open file discovery at arraignment pursuant to Supreme Court rules. This, according to them, obviates the need for further discovery requests in Missouri, though they indicated that public defenders nevertheless routinely submit "boilerplate" discovery requests. MSPD attorneys expressed their strenuous disagreement with this position. According to MSPD attorneys, unless they formally request discovery, it will not be provided. One senior MSPD supervisor reported that "*Brady*, as such," has been turned over only a handful of times in her experience. But given the competing demands on attorneys' time, it appears from discussions with both prosecutors and public

23

102

defenders that the pursuit of discovery is often limited to a one-time, formal request, rather than more extensive motions practice (*e.g.*, motions to compel) and hearings on questions of discovery.

- Completion of Legal Research

Attorneys reported that legal research may be the area that suffers most as a result of the caseload crisis. One lawyer—touted by her office as a star, and who explained that she works round the clock, doing most of her case preparation in the evenings at home—said that she simply does not have time to do legal research. Earlier in her career she did have time, and so she has developed expertise in certain types of cases where she feels comfortable with the law, and appreciates the significance of being well-versed in the relevant authority. However, now that she has become more senior, she lacks the time to research, despite the fact that her cases are growing increasingly serious, and involve increasingly complicated legal questions. Recognizing that motions practice based on solid research can be essential in complicated, high-level cases, she explained that she spends most of her days in court, with clients, and often actively trying cases, so research feels more like a luxury.

In Saint Louis City, moreover, attorneys' ability to adequately research issues pre-trial is constrained by a system where one can receive a phone call mid-morning announcing that trial will begin hours later.[15] This manner of trial call means that important investigation and research projects are often cut short by sudden trial calls.

Attorneys from all over the state, not just St. Louis City, however, made clear that legal research suffers dramatically as a result of the caseload crisis. In one office, the paralegal does all the research. In fact, the paralegal is responsible for drafting any new motions (that are not in

---

[15] On July 14, 2009, Bob Spangenberg and David Newhouse interviewed St. Louis City prosecutors. Those prosecutors indicated that significant efforts to change this peculiar docketing system have led to substantial improvements, with more changes anticipated. They concurred that it is untenable to begin a trial—irrespective of whether one is a prosecutor or a defense lawyer—on a day's notice.

24

103

the existing motions bank) and even briefs to the court of appeals—to which attorneys, we were told, "very rarely make a change." Another lawyer explained that lawyers "do not have time to do the research they need to do" because they are in court all day, even though the paralegals themselves are overwhelmed with cases.

One attorney explained that she believed that there were cases where if she completed the legal research, she would likely find issues worth pursuing, particularly in the context of suppression motions. We were also told that lawyers do not frequently research the collateral consequences of pleas, and so often they either fail to inform clients regarding those consequences altogether, or they provide far less information than required. One attorney expressed the feeling that "attorneys simply cannot provide effective representation in all cases" emphasizing that there "are situations where the attorneys do not know the ramifications of the pleas they are entering" and "may be too quick to plead when the client says they want to plead and get it over with."

- Pre-hearing/Pre-trial Preparation

We were told that attorneys make a bona fide effort to prepare for trial. The trouble is, according to many lawyers, they have too many cases headed for trial at the same time. Inevitably, then, there is triage among trial cases. One attorney explained that his experience of trial triage led to less preparation in those types of cases where he felt more familiar. For instance, he said that by the time he grew comfortable handling robbery cases, he was stepping up to more serious cases, including homicides. So he found that he would do fewer depositions in robbery cases, saving time for the more serious cases with which he had less experience. He sacrificed the robbery depositions even though he knew that in a robbery case, where issues like identification often make or break the case, depositions are critical. But because he felt "more comfortable with robbery cases" but "extremely nervous about sex cases," he made the decision to put more time into the latter.

25

104

Trial preparation, moreover, is inextricably intertwined with investigation and legal research, two areas where attorneys report they are consistently failing. In other words, while one can write out a cross-examination of a critical witness, if one has neither deposed the witness nor visited the crime scene, the bulk of the cross-examination will be dangerously blind. Similarly, a lawyer may file a motion to suppress, but without an opportunity to research the relevant and changing Fourth Amendment authority, it cannot be said that he or she is prepared for a substantive hearing.

- Pre-Sentence Preparation

Attorneys reported that, even though the vast majority of cases are disposed of by way of guilty plea, very little preparation goes into sentencing. Given the infrequency of contact with clients, it is also difficult for attorneys to conduct a thorough sentencing investigation tailored to the background and personal characteristics of the client, one which goes beyond the criminal history and terms of the plea agreement. Attorneys reported that one perceived tragedy of the caseload crisis was the elimination of the 15-year-old alternative sentencing programs. These programs were shut down in order to convert the 8.5 FTE's to attorney positions.

In addition to those fundamental obligations identified in the ABA's First Guideline, 2009 site visits in Missouri revealed a host of other fundamental obligations that were not being fulfilled adequately, signaling a growing crisis in excessive lawyer workloads.

- Filing Appropriate/Essential Pleadings

Several attorneys reported that the "triage" approach has become so dramatic that at times essential pleadings simply are not filed. As one lawyer put it: "Lawyers in [this] office are struggling and are about to implode. A good chunk of the lawyers in the office are on the verge of imploding. The system of triage is pretty scary. [Attorneys are] forgetting to file alibi notices, no investigation is going out, and [lawyers are] losing track of clients in the jails. You have to have the ability to focus on your work in the midst of chaos." Another public defender reported

26

105

that a person would go crazy if he tried to meet the performance standards that are set out for all public defenders. There simply are not enough hours in the day. Many days he works until 9:30 or 10 p.m. Yet, according to her:

> There are times when I would like to file motions to suppress but there is simply not enough time to do that. There is not enough time to raise important issues. We all have taken the position that you just have to do what you can and take the consequences later. There is an expectation that you will be called on a PCR [post-conviction relief] hearing at some point because of the ineffective assistance of counsel on a given case or on many cases. We are constantly being forced into being ineffective; it affects morale and how the lawyers view the adversarial system. Everything becomes eroded. Many people plead to things that they probably didn't do because they cannot keep coming back to court or they just get sick of it.

Likewise, another public defender in St. Louis stated, "the caseload makes me forget to do important tasks, like one instance when I forgot to file a motion for a new trial." He added that "there is an unwritten policy in the office that depositions are not done on C or D felony cases." We are convinced that lawyers are effectively forced to choose which cases they will actively pursue and rush the rest of the cases through the system.

- **Zeal Vitiated by Morale**

While recognizing and placing great value on the duty of zealous advocacy on behalf of clients, attorneys interviewed expressed their concern that when morale drops to a certain point, it becomes difficult for attorneys to muster the energy to continue fighting, particularly when they are almost always defeated.

The theme of many of our conversations with attorneys and staff was a desire to do one's best undermined by the reality of overwhelming caseloads and unsustainable salaries. A support staff member in one office reported that "morale is horrible." An attorney reported that even though attorneys "want to get in there and fight for the client, the caseload is ridiculous and the pay is bad," noting that "if the economy was better, people would be jumping ship." Another

experienced attorney reported that, because of the caseload, "the constitutional rights and protections that make us who we are, are just being eroded" and that the bad economy has created a "ticking time bomb" before "a massive flight from the system for better jobs." Still another attorney explained that he can barely feed his family and confessed that "the sheer number of cases makes it impossible to do good work."

One attorney explained that sometimes she goes home and "feels so tired of losing"—particularly when it feels as if she has lost because of "a lack of resources or time." She explained that "it can crush the spirit" and make it "hard to keep the fire day to day." A supervisor explained that morale is affected by the stress level. An office manager explained that morale has gotten "increasingly worse" and that there have been "more complaints about attorneys being overworked." Another lawyer told us that she is able to do just enough not to get sued; she wakes up in the middle of the night with a feeling of suffocation.

It is worth noting that, frequently, we have found public defenders unwilling to admit that they have failed to do all that is necessary, for fear of being charged with ineffective assistance of counsel. Despite their "understandable reluctance" to report that "they either are not, or may not, be providing services consistent with their ethical duties and performance standards,"[16] MSPD attorneys demonstrated remarkable candor and bravery in their 2009 interviews, revealing concerns that clients were, in many cases, failing to receive the effective assistance of counsel because attorneys were simply unable to handle the devastating caseloads for which they were responsible. These lawyers should be commended for their efforts to expose the problem rather than simply shielding themselves. Their remarkable candor is a testament to their sincere dedication to the clients they serve.

- **Lack of Essential Supervision**

The ABA has concluded that adequate supervision normally requires:

---
[16]    Eight Guidelines at 9.

> (1) that meetings be held between an experienced lawyer supervisor and the lawyer being supervised; (2) that the work on cases represented by the supervisee be thoroughly reviewed through case reviews, mock presentations or other reviews; (3) that the lawyer supervisor reviews selected files of the supervisee; (4) that selected court documents prepared by the supervisee be reviewed; (5) that periodic court observations of the supervisee's representation of clients be conducted; and (6) that the number of cases represented by the supervisee, as well as their complexity and likely time commitments, be carefully assessed. In overseeing the work of those providing public defense services, it is important that supervisors have access to data through a management information system, which shows the lawyer's current caseload, the status of cases represented by the lawyer, and other important relevant data.

Eight Principles at 8.

The June 2009 site visits provided significant insight into the challenges of training, oversight, and evaluation at MSPD. The conversations with attorneys—particularly outside of Kansas City and St. Louis—painted a picture of a situation where supervisors lack the time to even discuss supervisees' cases, much less conduct mock presentations or review draft pleadings. Supervisors simply cannot do the job they are tasked with doing; it is just too much. It was reported to us that most public defenders around the state, including supervisors, carry full caseloads. Nor is this a new situation. In *Fixing Missouri's Broken Public Defender System: Pay Up Front or Pay the Consequences* (2008), it was observed that:

> almost all of the District Defenders, those attorneys in supervisor positions, carry full caseloads. With the demands of such cases, the result is inadequate training, monitoring, and supervising of personnel. The Director stated that this issue increases the risk of liability of the state, leads to a high turnover rate for attorneys, and decreases the quality of representation for clients.

*Id.* at 9. As described in the article, as well as to us in our 2009 interviews, the demand of supervisors' own caseloads—particularly the homicides, sex crimes, and other serious felonies—inevitably results in inadequate mentoring, training and supervision of personnel.

Several attorneys expressed concern that even when supervisors carry a reduced caseload, they lack sufficient time to dedicate to the development of more junior attorneys. One attorney explained the dilemma of a reduced supervisory caseload as follows:

> [A supervisor's caseload] is not higher than the recommended caseload. But, [supervisors] are still working just as much. The half-load that you get consists of the worst cases that come into the office. They are the most difficult and the most complicated. They are emotionally difficult. You also become the therapist for the staff. On paper, it may look like a lower caseload but it is not. You are still working the same amount of time as those who have more of a caseload. Even if you take away half of those cases, the rest of the time would be spent on the remaining cases because there is so much more that needs to be done.

This attorney explained that he was sure, at the end of each case, that he had not done enough.

Another attorney explained that she knew she needed to be supervising certain attorneys and cases more closely, but that "it's hard to keep track of people." She said that there are attorneys who "need extra help" but that oftentimes those are the attorneys who do not seek out supervision. Her conclusion was that she needed to "reach out" to them but, unfortunately, that rarely happened because she simply had too many things to do and her attention was often focused on those attorneys diligent enough to seek out her guidance.

Supervisees conveyed a sense of near-panic at the lack of supervision provided in the face of overwhelming caseloads. One entry-level attorney told us that she had only been in the office for six weeks and had already accumulated seventy cases, a mix of felonies and misdemeanors. She explained that she does not know what to do, has had very little supervision, and is "scared to death" of going to court. A senior PD explained that with high turnover, there are always many new attorneys, but due to caseloads, there is no supervision; what results is a crop of attorneys faced with crushing caseloads who "*do not know what effective representation is*" due to a crippling lack of experience and supervision

These observations with respect to training represent a significant change from the 2005 report, which gave high grades to the MSPD's training program, and are a symptom of a system that is in decline.

- Client Complaints & Lack of Trust

"Client complaints may also be an indication that representation is inadequate due to excessive workloads." Eight Guidelines at 10 n.24. One public defender stated that many clients get angry because they think they are just getting passed through the system. As a consequence, the attorney has to spend a lot of additional time working to earn the trust of skeptical clients. Many clients feel that the public defender simply pushes pleas because they want to get rid of the case and have fewer to deal with.

One experienced lawyer in the St. Louis City office stated that more and more clients are saying, "I feel sorry for you because you have such a high caseload." She added that, "if you had more time to talk to them that would be different. You don't even realize how much more you could do for the clients. There are a lot of reasons why. Sitting down in an office and having an hour-long meeting with every client is simply impossible. Being able to sit at the jail as long as you need because you've got to gain their trust is impossible. Here you just feel like you have to go through the basics—try to establish your rapport with them, a trust level with them—and every time I go to the jail I have to see five people. That takes me half a day."

One lawyer reported that if her clients trusted her, they would get better results in their cases. For instance, she would be able to persuade a client that it was worth turning down a plea offer to fight a good suppression issue, or in the opposite scenario, convince a client to believe her when explaining that his suppression issue was frivolous but that the plea offer was a good one. She explained, however, that she simply lacks the time to build the attorney-client relationship she would need to achieve these objectives. Faced with so much cynicism and

skepticism on the part of clients, several attorneys reported that client contact at times seems counter-productive.

This evidence strongly supports the conclusion that MSPD attorneys are regularly unable to comply with their fundamental obligations to clients, examples of which are provided by the ABA's First Guideline. It appears, moreover, that the situation has only grown worse over time.

### B.   MSPD'S FIFTEEN-YEAR EFFORT AT REFORM

**1993: Signs of "Near-Crisis"**

As previously discussed, in June 1993, the Spangenberg Group released its first study in connection with Missouri's Public Defender System. That study noted that while there had been a substantial increase in funding in connection with the creation of a state-wide public defender system in 1989, the bulk of that funding went to overhead connected with opening several new offices. Two essential problems, dating as far back as 1993, were simply neglected: "staff salaries [and] staff caseload." 1993 Report at 4. Remarkably, the findings from the 1993 Report closely mirror our present findings, although the problems appear to have grown far worse over time:

> [T]he increased caseload and the low salaries have led to a high turnover of staff over the last two years and several additional experienced attorneys indicated that they may also leave. The effect of the workload, the low salary and the turnover has not surprisingly resulted in morale problems in some offices. Many attorneys feel that without additional resources, they will not be able to provide competent representation to all of their clients. We echo this sentiment in very strong terms.

1993 Report at 5. The 1993 Report concluded that the "necessary resources to provide competent representation," that "[t]he legal staff need[ed] to be increased," and that an emphasis needed to be placed on "salary increases and increas[ing] support staff." *Id.* at 6. As far back as 1993, "all staff members [were] underpaid [and] overworked." *Id.* at 7. The 1993 Report found that there were "serious problems" requiring immediate attention and that MSPD

was facing a "near-crisis" situation, *id.* at 2, 8, and that, "[i]n a word, the Missouri State Public Defender system is the most poorly funded of all the state public defender systems in the country," *id.* at 20. Following the issuance of the 1993 report, the MSPD began the long process of seeking additional funding and personnel from the Legislature.

*2002-2006: Efforts to Expose the Crisis Succeed as Efforts at Change Fail*

Close to a decade later, in February 2002, the American Bar Association published its Ten Principles of a Public Defender Delivery System, discussed *supra* at 10.

Despite requests for more funding year after year, MSPD was consistently denied the substantial additional resources it required. As Douglas Copeland, former President of the Missouri Bar, explained, "I guess I was kind of easy and more understanding of the legislators when we had those very difficult budget years back pre-2005." He noted, however, that this excuse could not explain why the legislature had failed to act in the years following 2005, when it had a budget surplus.

Copeland explained that it was not until appropriations hearings at the beginning of the 2005 legislative session that there began to develop an "awareness that had been lacking prior to that time . . . as to the magnitude of the problem and the potential for a collapse of the public defender system, and what would obviously then be the collapse of the criminal justice system." In 2005, after it became clear that disaster was imminent, the Board of Governors of the Missouri Bar created a Public Defender Task Force to explore the contours of the crisis. On June 10, 2005, the Public Defender Commission made its findings explicit, announcing that "with increasing caseloads and without increased staffing, there is no effective control over the Missouri State Public Defender caseloads. The Commission further finds that the situation is already at a crisis level with trends pointing to an impending disaster in Missouri's criminal justice system."

In July 2005, the Task Force contracted with TSG, as discussed above, to analyze, review and prepare a report on the state of the MSPD. The 2005 study concluded that:

> [W]e remain convinced that the Missouri State Public Defender System is operating in a crisis mode and cannot ensure that clients are being provided with adequate and meaningful representation day to day . . . [W]e are able to determine that the program is severely under-funded, the salaries are pathetic, and that the appropriation for the Missouri State Public Defender is the lowest of all state public defenders in the country.

TSG found that MSPD had failed to meet seven of the ABA's Ten Principles. TSG further concluded that "in order to reach the average per capita expenditure for all southern states, Missouri would need an additional appropriation of $16 million." At that time, MSPD Director J. Marty Robinson announced that MSPD would have to hire 100 more attorneys to bring the current system up to the caseload standard of 235 cases per attorney per year, a standard that had been established by Governor John Ashcroft *in 1989.*

Armed with this information, the Public Defender Task Force endeavored to attract the attention of government decision-makers as well as the general public.[17] While its efforts at publicity were successful, and led to some improvements,[18] they failed to effect major change. The Missouri Bar, in Douglas Copeland's view, "spent a lot of time bringing [the situation] to the attention of the legislators and to the governor's office to the point where they can no longer say, 'We didn't understand that there's a problem.'" Shortly thereafter, in 2006, the ABA Standing Committee on Ethics and Professional Responsibility issued its ethics opinion,[19] discussed above, which made clear that there are no exceptions for public defenders, as the rules of professional conduct require *all* lawyers to furnish competent and diligent service to their

---

[17]    The Eight Guidelines make clear that seeking public support from "bar associations, community groups, and the media" are appropriate, and indeed advisable, avenues for indigent defense providers to pursue. Eight Guidelines at 21.

[18]    For instance, their efforts did result in repositioning salary increases ranging from 4 percent to 8 percent over the cost of living increase.

[19]    ABA Committee On Ethics and Professional Responsibility, Formal Opinion 06-441 (2006).

clients, irrespective of their means. While the Legislature did provide $2 million for pay raises in 2006, in an effort to slow a record turnover rate, Copeland made clear:

> I know [the legislature] gave [MSPD] two million bucks, . . . but it
> still left us at 49th among 50 states. It's a hard nut to crack, to
> understand how the legislature works as a body and doesn't get
> problems like this resolved.

*Notice to Legislature of Imminent Constitutional Crisis*

As more and more indicators pointed to the fact that MSPD was confronting a crisis of great magnitude, the Missouri Senate established an Interim Committee on the Missouri State Public Defender System. The committee was tasked with reviewing the then-current effectiveness of the MSPD. Copeland reported that the three main concerns of the Bar were as follows:

- A "fear that the public defender members of the Bar are currently required to violate the ethical code of attorneys because their caseload is so great";
- A concern "that indigent criminal defendants might not be adequately represented"; and
- A concern that "the criminal justice system is not working for all people."

The Missouri Senate took testimony on these questions, including the testimony of Norman Lefstein, professor of law and long-time expert in indigent defense services, before the Missouri Senate Appropriations Committee. Professor Lefstein explained that he had been familiar with MSPD since the late 1980's. Even then, he testified, experts were "shocked by [its] intolerably overburdened condition" demonstrating "that the problems of the Missouri Defender are of long duration." Statement of Norman Lefstein on the Missouri State Public Defender System at 3 (Jan. 29, 2007). In its 2007 corrected report, the Interim Committee settled upon four issues,

---

rules of ethical and professional conduct applicable to attorneys licensed to practice law in Missouri. According to Senator Goodman, "Because of a growing shortage in personnel in the public defender system, some attorneys have a larger caseload than they are ethically really able to handle," adding that, "[w]hen you have a caseload that is too large, you don't have time to devote to each case like you should."

Despite unanimous passage in the Senate and a substantial majority in the House, on July 13, 2009, Governor Nixon vetoed the bill, reasoning as follows:

> Senate Committee Substitute for Senate Bill No. 37 reflects a well-
> intentioned effort by the General Assembly to address the
> challenges being experienced by the Missouri Public Defender
> System. However, while I acknowledge that the public defender
> system is operating under significant stresses, I disagree that the
> solution is to allow the Public Defender Commission to establish
> maximum caseload standards and create waiting lists for criminal
> defendants.
> . . .
> While I commend the General Assembly for its effort in addressing
> this issue, after considerable thought and consideration, I have
> concluded that this approach vests too much unfettered discretion
> with the Public Defender System to set maximum caseload limits
> that will result in significant responsibilities shifting to other
> participants in the criminal justice system to the detriment of all
> parties, including crime victims, without appreciable benefits being
> realized.

The governor's veto led the St. Louis Dispatch to conclude, in an editorial, that "Missouri public defenders should ready the doomsday option." The editorial board set forth the history as follows:

> Caseloads have been climbing for years while state spending
> remained flat. Public defenders began pleading for better funding
> nearly a decade ago but were told by lawmakers to explore other
> solutions. So they set out to develop standards for maximum
> caseloads, but were told that they lacked the legislative authority.
> SB 37 would have given it to them. With his veto, Mr. Nixon has
> returned public defenders to square one—agreeing that they have
> been correct from the start: They need more resources, which
> means more people, which means more money.

---

designated as "crises," which it found the "most severe and concerning," namely the: 1. Caseload Crisis; 2. Retention Crisis; 3. Management Crisis; and 4. Office Space Crisis.[20]

The Public Defender Commission's 2007 annual report echoed these concerns, and made clear that the severity of the crisis left open only one viable option: "Only by refusing cases, a move that would precipitate a constitutional crisis in Missouri's courts, can Missouri's Public Defenders meet the ethical considerations they are bound by. A solution must come from outside the Public Defender System and it must come soon." The Chief Justice of the Missouri Supreme Court, Laura Denvir Stith, in her 2008 State of the Judiciary Address, took the following position:

> Few [of the state's needs] could be more critical than in the
> criminal justice system, where we are on the verge of risking
> release of some prisoners for failure to give them a speedy trial
> because there simply is no public defender available to advocate on
> their behalf. I cannot emphasize enough the urgency of this
> crisis[.]

Senate Bill 37, sponsored by Republican Senator Jack Goodman, which proposed to set caseload maximums and contract with private attorneys to handle cases exceeding those maximums, was held out as one possible solution. Senate Bill 37 proposed to establish maximum caseload standards to ensure that the system was adequately fulfilling the state's constitutional obligations to provide effective assistance of counsel and was complying with the

---

[20] *See Fixing Missouri's Broken Public Defender System: Pay Up Front or Pay the Consequences* (2008) at 10-11.
    The office space crisis must be addressed before the caseload crisis may be resolved. As it stands, pursuant to Section 600.040.1, the burden and expense of office space and utility services for local public defender offices rests with the county served by each office. County governments are often reluctant to shoulder this burden, perceived as an unfunded mandate, with serious consequences. Public defenders "have endured the indignities of insect infestation, lack of privacy, leaky roofs, and cramped quarters, to name a few." 2008 Fiscal Report at 82. Even more important, there simply is not enough space. If the desperate need for more attorneys is fulfilled, there will be no space to put them, and MSPD will be at the mercy of the counties—counties who have let the lights go out and the rent go unpaid (leading to eviction notices).
    A change in the legislation, specifically the repeal of Section 600.040.1, is necessary if meaningful change is to be effected.

---

July 17, 2009 Editorial, at A16. It concluded that if MSPD is pushed to handle caseloads so large that clients cannot be provided with adequate representation, it will be left with only one option, to "turn down cases," because "[t]hey have no alternative." Their "duty is to say 'no' if they can't meet their professional obligations."

*Notice to Courts of Inability to Accept Additional Appointments*

The MSPD did not limit its efforts to the legislature, however. It sought relief in the courts as well. In November 2007, the State Public Defender Commission voted without dissent to adopt a procedure by which it could refuse new cases. The procedure authorized the director of the MSPD to declare an office "of limited availability" when its caseload became excessive. The MSPD Deputy Director of Litigation's assessment was that most offices were already "at a crisis point and could qualify."

Its efforts to implement the procedure, however, were cut short by the courts. In August 2008, Director of the MSPD, J. Mary Robinson, determined that the District 13 Public Defender Office had exceeded the maximum caseload standard for a period of three consecutive calendar months. Pursuant to the 18 CSR 10-4.010(2)(b), on August 27, 2008, the Director notified the presiding Judge of the Thirteenth Judicial Circuit that the District 13 Office was at risk of being certified for limited availability.

On October 1, 2008, the Director certified the District 13 Office to be in limited availability status. The Director accompanied the certification with statistical verification showing that the District 13 Office had exceeded its maximum allowable caseload under the Public Defender Commission's Caseload Crisis Protocol for at least three consecutive months. On October 6, 2008, the District Public Defender notified the presiding judge of the Thirteenth Judicial Circuit that the District 13 Office had been certified as being of limited availability. The District Defender informed the court that the District 13 Office would not accept probation

violation proceedings pursuant to a suspended execution of sentence until the District 13 Office was reinstated to full availability.

When a public defender attempted to put this policy into practice, however, filing a written notice with the court that the public defender was unavailable to represent a defendant in a probation revocation matter, the judge refused, appointing the public defender to the case, despite the regulation and the notice.

On November 20, 2008, the Missouri Public Defender Commission, the Director of the Public Defender System, and the individual public defender subsequently filed a petition for a writ of prohibition with the Court of Appeals for the Western District, seeking to restrain the trial judge from appointing the public defender to the indigent probationer's case. The Court of Appeals granted a stay of the probation violation hearing and initially issued a preliminary order in prohibition restraining the judge from proceeding further in the case.[21]

The Court of Appeals for the Western District, relying on Section 600.042.4 of the Missouri Revised Statutes, concluded that—contrary to the MSPD's claim that the judge lacked jurisdiction, had exceeded his authority, and had abused his discretion in appointing the public defender—the judge did not err. To the contrary, the Court of Appeals concluded that an agency regulation is void if it is beyond the scope of authority conferred upon the state agency or if it attempts to expand or modify statutes. In its view, the "Public Defender Commission's regulation to not accept assignments on probation violation cases where the defendant had previously received a suspended execution of sentence conflict[ed] with section 600.042(3) [which] requires the Public Defender to represent those indigent defendants facing a violation of probation or parole." The Court of Appeals rejected the argument that the language of chapter 600.042.3 permitted such regulations. According to the Court, section 600.042.3 "does not give

---

[21]    The case was subsequently consolidated with another matter in which a public defender had been appointed to a probation revocation matter "as a member of the local bar."

---

the director and the defenders discretion to refuse to accept cases they are mandated to accept under section 600.042.4."

At the close of the opinion, the Court included a significant, final footnote:

> As an intermediate appellate court, this court is bound to follow the law established by the Missouri Supreme Court. As this court is a court of error and not a policy making court, we are bound to follow the Supreme Court's decisions . . . [which have] held that the Director cannot refuse to represent the persons who are entitled to representation under section 600.042.4.[22]

*The Caseload Crisis Time Study*

As part of its efforts to develop caseload standards for determining when an office's caseload became excessive, the MSPD conducted the Caseload Crisis Time Study from September 20, 2006 through November 14, 2006. Using a computerized time-keeping system, the study collected data on the amount of time attorneys and support staff spent on different types of case activities and involved all public defenders. Attorneys were asked to record the number of hours, in fifteen minute increments, spent on general case-related activities, case specific activities, and non-case related activities. The total time per day was then compared to the organization's payroll timesheets to ensure that time was being entered for all activities. Prior to the data collection period, training materials were developed and staff members were required to participate in training sessions.

Table I displays the results of the MSPD case weighting study as analyzed by TSG. These are the raw results, and represent the actual time spent per disposition in the various case type categories.

---

[22]    State ex rel. Public Defender Comm'n v. Hamilton, 2009 WL 987468 at 8 n.11 (Mo. App. W.D. Apr. 14, 2009)

---

| Table I:  Time Study Results using 1812.5 Available Attorney Work Hours[23] | | | |
|---|---|---|---|
| Case Type | Hours | Dispositions | Current Workload (non-Conflict Dispositions per Year) |
| A - B Felony Sex | 6,917 | 103 | 67.2 |
| A - B Felony Other | 12,983 | 498 | 26.1 | 70 |
| A - B Felony Drug | 5,417 | 502 | 10.8 | 168 |
| C - D Felony Other | 1,252 | 65 | 19.3 | 94 |
| | | | |
| *Major Felony Total* | *26,569* | *1,168* | *22.8* | *80* |
| C - D Felony Other | 25,021 | 3,272 | 7.6 | 237 |
| C - D Felony Drug | 7,105 | 1,070 | 6.6 | 273 |
| | | | |
| *Minor Felony Total* | *32,126* | *4,342* | *7.4* | *245* |
| All Felony | 58,695 | 5,510 | 10.7 | 170 |
| All Misdemeanor | 8,937 | 3,166 | 2.8 | 642 |
| Misd. – Traffic | 1,552 | 1,542 | 1.0 | 1801 |
| All Misdemeanor | 10,489 | 4,708 | 2.2 | 814 |
| Probation Violation (F) | 4,787 | 2,214 | 2.2 | 838 |
| Probation Violation (M) | 1,346 | 860 | 1.6 | 1158 |
| All Probation Violation | 6,133 | 3,074 | 2.0 | 908 |
| Juvenile Violent | 1,642 | 198 | 8.3 | 219 |
| Juvenile Non-violent | 1,592 | 332 | 4.8 | 378 |
| Juvenile Status | 144 | 57 | 2.5 | 715 |
| All Juvenile | 3,379 | 587 | 5.8 | 315 |

While TSG researchers are satisfied that the methodology used during the time keeping period accurately captured the amount of time spent on these case types, the results only provide an accurate description of a system in crisis. Any reliance on these numbers, even as a baseline from which to develop appropriate caseload standards, would only serve to institutionalize an already crippled system.

The conclusion that MSPD attorneys are faced with such obstacles to the provision of effective representation is further supported by their responses to the Time Sufficiency survey, which was conducted in conjunction with the case weighting study.

---

[23]    Assuming a 40-hour work week, a full-time attorney is paid for 2,080 hours per year. Subtracting 216 average holiday and annual leave hours, and an additional 51.5 hours in attorney sick leave taken during 2006, the average attorney had 1812.5 available work hours per year.

---

For each of the separate tasks, MSPD asked attorneys and support staff to evaluate the statement, "I have enough time to complete the activity in a reasonable and satisfactory way." The response index ranged from "Almost Never- below 20%" through "Often- above 80%." A response "NA- not my job" was included for tasks or functions that attorneys or support staff did not regularly perform or indicated they did not apply to their specific job.

For each task, average response scores were constructed. As these tasks were determined to be essential by MSPD, items with average response scores below 3 represent items where attorneys feel they "almost never" or "infrequently" or "sometimes" have enough time to complete the activity in a reasonable and satisfactory way. Table II presents the average attorney response scores by functional area (MSPD functional area divisions used). Most areas fall below the average 3 score. Indeed, attorneys report only two functional areas – client contact and pre-trial investigation – in which, on average, they sometimes have enough time to complete the activity satisfactorily. In all other activities, especially for preliminary hearings, the attorneys infrequently have sufficient time.

| Table II:  Average Attorney Responses from the Time Sufficiency Survey (by Functional Area) | |
|---|---|
| Functional Area | Average Response |
| Bond | 2.31 |
| Preliminary Hearing | 1.65 |
| Client Contact | 3.55 |
| Motions | 2.23 |
| Investigation / Preparation Guilty Plea | 2.64 |
| Investigation / Preparation Trial | 3.54 |
| Sentencing | 2.28 |
| Ministerial Tasks | 2.61 |
| Experts / Records | 3.31 |
| Medical / Physical Injury | 2.99 |
| Mental Health | 2.60 |
| Forensic Science | 2.70 |

One of the most evident failures of the current system, and one echoed in virtually every interview conducted with attorneys and support staff at the MSPD during our site visits, is that

there is a tremendous lack of support staff resources available. As Table III demonstrates, TSG found that only about one-third of the total time spent on cases comes from support staff. Put another way, for every hour of attorney work, there are only enough support staff resources to provide 30 minutes of support, a level that is woefully inadequate when compared to other jurisdictions. Our site visits confirmed that, due to the remarkable lack of support staff, public defenders are required to spend a great deal of time on what is properly support staff work; the time lost is time that could be spent doing legal work which support personnel are not equipped to perform.

**Table III: Comparison of Attorney and Support Staff Hours**

|  | Attorney Hours | Staff Hours | Staff % of Total Hours |
|---|---|---|---|
| A – B Felony Sex | 6,917 | 3,867 | 36% |
| A – B Felony Other | 12,983 | 7,556 | 37% |
| A – B Felony Drug | 5,417 | 1,908 | 26% |
| C – D Felony Sex | 1,252 | 719 | 36% |
| C – D Felony Other | 25,021 | 12,225 | 33% |
| C – D Felony Drug | 7,105 | 2,619 | 27% |
| All Felony | 58,695 | 28,894 | 33% |
| Misdemeanor | 8,937 | 3,774 | 30% |
| Misd. – Traffic | 1,552 | 1,313 | 46% |
| All Misdemeanor | 10,489 | 5,087 | 33% |
| Probation Violation (F) | 4,787 | 1,653 | 26% |
| Probation Violation (M) | 1,346 | 498 | 27% |
| All Probation Violation | 6,133 | 2,151 | 26% |
| Juvenile Violent | 1,642 | 1,079 | 40% |
| Juvenile Non-violent | 1,592 | 598 | 27% |
| Juvenile Status | 144 | 61 | 30% |
| All Juvenile | 3,379 | 1,738 | 34% |
| Total | 78,696 | 37,869 | 32% |

*Staffing Ratios*

This alarming inadequacy is further supported by MSPD staffing records from the last six years, which show there is roughly one-half an FTE support staff person for each attorney. This is the lowest staff-to-attorney level of any jurisdiction recently studied by TSG. As Table IV indicates below, Missouri's staff ratio – especially in felony cases – is almost twice as low as that

43

found in Maricopa County (Phoenix), Arizona. It is just 70 percent the size of other jurisdictions in a national study conducted by the federal Bureau of Justice Statistics, and as TSG strongly concludes, it rests at a level that is woefully insufficient to provide effective and adequate representation to MSPD's clients.

**Table IV: Comparative Staff Support**

| Jurisdiction | Attorneys | Investigators | Other Support | Total Support | Investigators per Attorney | Other Support per Attorney | All Support per Attorney | Source | Year |
|---|---|---|---|---|---|---|---|---|---|
| Maricopa County, AZ PD (one of three agencies) | 210 | | | 220 | | | 1.05 | http://www.mdeforum.org/index.html | 2008 |
| DE | 73 | 16 | 54 | 70 | 0.22 | 0.74 | 0.96 | http://publicdefender.delaware.gov/DocsDeptpaymts.pdf | 2005 |
| CT | 203 | 63 | 124 | 187 | 0.31 | 0.61 | 0.92 | http://www.ock.state.ct.us/CountyAnnual0809/0809 Public.htm | 2008 |
| Pima County, AZ | 79 | | | 71 | | | 0.90 | Pima County Cost Weighting Study - TSG - 2002 | 2002 |
| RI | 46 | 8 | 29 | 37 | 0.17 | 0.63 | 0.80 | New England Public Defenders Conference - 2008 | 2008 |
| MT | 104 | | | 83 | | | 0.80 | http://www.publicdefender.mt.gov/forms/oldFY08StaffingByRegion.pdf | 2008 |
| WY | 46 | 5 | 27 | 32 | 0.11 | 0.59 | 0.70 | http://wyomingpublicdefender.org/staff.html | 2008 |
| KY | 375 | 60 | 167 | 227 | 0.16 | 0.35 | 0.68 | Kentucky Dept. of Public Advocacy | 2010 |
| CO | 289 | 93 | 103 | 196 | 0.32 | 0.36 | 0.65 | Colorado Public Defender | 2008 |
| MO (All Divisions) | 342 | 58 | 145 | 202 | 0.17 | 0.42 | 0.59 | | 2008 |
| MO (TRIAL) | 276 | 47 | 97 | 144 | 0.17 | 0.35 | 0.52 | | 2008 |
| Bureau of Justice Statistics (100 largest counties in US) | 630 0 | | 1200 | 3400 | 4600 | 0.19 | 0.54 | 0.73 | http://www.ojp.usdoj.gov/bjs/pub/pdf/ind... | 1999 |

As discussed above, during our 2009 site visits, members of TSP held meetings in Kansas City and St. Louis with a number of District Defenders and other experienced attorneys from across the state. The participants' feedback supported and amplified the findings noted above and reinforced our conclusions from other interviews performed during our site work. Put plainly, there is a tremendous lack of support staff available to assist attorneys in their daily

44

practice. Attorneys are spending time on activities that should be performed by support staff, and largely as a result, the MPSD's lawyers are so overloaded with cases that they are unable to provide effective representation in all of their cases.

*Comparative Caseload Standards*

When TSG began this project, it fully expected to provide caseload standards specific to the MSPD system; indeed, a robust, well-functioning system of defense can benefit from caseload standards that help to ensure that public defenders are not overburdened in the provision of defense services. However, the current state of affairs in Missouri is so dire, the resources so limited, and the participants so accustomed to a system that is fundamentally broken that caseload standards are not only inappropriate at this point but would serve only to institutionalize bad practices.

The findings above on staffing indicate how much of the attorneys' time in Missouri is taken up with tasks that ought to be—and in other jurisdictions are—the responsibility of support staff members. To incorporate these activities into a caseload standard would only endorse the division of time in Missouri between public defenders and their staff, a situation that is fundamentally flawed. Before determining the maximum number of cases that Missouri public defenders should be handling, state leaders must first provide sufficient staff resources so that attorneys are truly doing the work of legal advocates and not serving also as investigators, paralegals, and secretaries.

TSG also has concerns about whether public defenders are truly representing the full panoply of eligible defendants, or if they are systematically missing or turning away particular categories of defendants. Given TSG's serious concerns about the latter, *See infra* at 53-60, we fear that the universe of cases upon which the time study was based does not represent an adequate sampling of cases which public defenders *should* be handling. Whether this situation reflects a deliberate decision of the MSPD to turn away clients or instead represents a system in

45

which potential clients do not seek the services of a public defender even when they are eligible, the results are the same: an already overburdened MSPD is not serving potential clients, and any ensuing caseload standard would institutionalize present practices by condoning the status quo.

Finally, TSG notes the conclusion of the attorneys who participated in the caseload adjustment meetings that the environment within which attorneys are currently working makes it impossible to estimate the average amount of time a case should take in order to provide effective representation. Although well intentioned, it is as if public defenders have been forced to practice so long in a broken system of representation that they do not know and cannot even imagine what an acceptable system of defense would permit. To be sure, they can estimate their current workload, but when asked to estimate the resources and caseloads necessary to provide an effective and acceptable level of representation, participants could not provide a collective answer. Missouri's system of public defense is so underfunded, and the staffing so inadequate, that MSPD will require substantially more resources before most of its lawyers can fully comprehend all the requirements that an adequate system necessarily entails.

A comparison to caseload standards in other jurisdictions may help Missouri officials to understand just how underfunded and inadequate their system of public defense has been. Note that the following discussion and presentation of comparative caseload standards are *not* specific recommendations for MSPD, but instead are presented to provide a context in which to view the current caseloads handled by the system. As already argued, any attempt to develop appropriate attorney caseloads for the MSPD must be accompanied both by a substantial increase in resources and intensive efforts to ensure that the MSPD is representing the full range of eligible clients.

Moreover, it should be emphasized that caseload standards are not appropriate for measuring the quality of representation provided to clients in any individual case. Nor, without additional data, is it appropriate to apply these standards to any individual attorney, small group

46

of attorneys, or even a small office. Individual attorney workload must always take into consideration the experience of the attorney, the difficulty of their current cases and the amount of support available to the attorney in terms of clerical, investigative and administrative resources.

In 1971, the Law Enforcement Assistance Administration, a federal agency within the United States Department of Justice, commissioned the National Advisory Commission on Criminal Justice Standards and Goals (hereinafter "NAC"). One of six reports issued by the NAC, the *Report on Courts*, published in 1973, has had substantial impact because it is the only national source that has attempted to quantify a maximum annual public defender caseload. During the preparation of the *Report on Courts*, the NAC relied mostly on qualitative and anecdotal information to formulate its standards.[24] Although the NAC Standards have not been formally adopted by the American Bar Association, the standards have been cited by the ABA and referred to by some practitioners and researchers in the criminal justice field, if only for the lack of other readily available numerical national standards. The Ten Principles, *supra* at 10, state that "National caseload standards should in no event be exceeded," and references the NAC standards as an example of existing national caseload standards.

The NAC *Report on Courts* articulated express standards for indigent defense services with the goals of expanding resources for professional and support staff; increasing the amount of state versus county funding of indigent defense services; and representing all eligible defendants during all stages of criminal proceedings. The NAC standards also called for specific criteria for initial client contact, parity of pay with attorney associates at local law firms, and numerical caseload levels.



[24]    *National Advisory Commission on Criminal Justice Standards and Goals: Courts*, Washington, D.C., 43, 265 (Jan. 1973).

With regard to the caseload levels of public defenders, the NAC established these numerical standards based on estimates by seasoned defense attorneys that public defenders should not handle more than 150 felonies per year, 400 misdemeanors per year, 200 juvenile court cases per year, 200 Mental Health Act cases per year, or 25 appeals per year *when that attorney is handling only one type of case.*[25] These standards were adopted based entirely upon estimates obtained from a number of advisory committee members.

The NAC standards certainly have their weaknesses, not accounting for local variations in practice, differences in case complexity, or ever-evolving laws and policies in the various states. Moreover, when the NAC standards were promulgated in 1973 the national landscape was much different than it is today or even a decade ago: capital punishment was not a sentencing possibility in any state; behaviors and crimes that did not exist in 1973, such as Internet-based crimes, have since become more prevalent; most jurisdictions around the country have instituted "tough on crime" policies, such as habitual offender statutes and "mandatory-minimum" sentencing requirements; mental health institutions have been de-institutionalized and closed, and many people with mental health disorders find themselves facing criminal charges and jail time in lieu of treatment. In addition to traditional penalties, many convictions now carry collateral consequences, such as the loss of government benefits, fewer employment opportunities, and deportation. The changes listed above, among several others, illustrate the increased complexity of providing adequate representation.

As much as TSG has concerns about the NAC standards – and about the process of using national caseload standards to draw conclusions about specific jurisdictions – it is nonetheless instructive to consider the NAC process when contemplating an "outer marker" for attorney

[25]    *National Advisory Commission on Criminal Justice Standards and Goals: Courts*, Washington, D.C., Standard 13.12 (Jan. 1973). For purposes of this standard, the term case means a single charge or set of charges concerning a defendant (or other client) in one court in one proceeding. An appeal or other action for post-judgment review is a separate case. *Id.* at 276.

caseloads. No responsible public defense system with which TSG is familiar would set its attorneys' caseloads any higher than the NAC standards, and by the same token, a caseload above the NAC level should be considered presumptively unreasonable. In this respect, TSG agrees with the "Statement on Caseloads and Workloads"[26] issued by the American Council of Chief Defenders (ACCD)[27] in August 2007, which recommends "that public defender and assigned counsel caseloads not exceed the NAC recommended levels…" The resolution goes on to state that, in many jurisdictions, maximum caseloads should be lower than those recommended by the NAC. The statement also discusses many of the reasons that representation of indigent defendants has become even more complicated since the NAC standards were developed, including, among other factors, increases in collateral consequences of convictions, an increase in the number of jurisdictions enacting persistent offender statutes and an increase in the severity of those penalties, a dramatic increase in penalties for people charged with sex offenses, and an increase in the number of juveniles charged as adults. No matter how these standards are defined, the caseload of the MSPD vastly exceeds acceptable levels, especially considering that the system has a woefully inadequate number of support staff.

The Washington (State) Defender Association has adopted caseload standards limiting the caseload of a full-time public defense attorney per year to 150 felonies; 300 misdemeanors; 250 juvenile offender cases; 60 juvenile dependency cases; 250 civil commitment cases; or 25 appeals cases with the case heard on the record. Those standards are careful to point out that additional consideration should be given to particularly complex cases, and set forth a case credit

[26]    http://www.nlada.org/
DMS/Documents/1189179200.71/EDITEDFINALVERSIONACCDCASELOADSTATEMENTsept6.pdf

[27]    The ACCD is a Section of the National Legal Aid and Defender Association.
http://www.nlada.org/Defender/Defender_ACCD/Defender_ACCD_Home

system for those more complicated case types.[28] It should be noted that these caseload standards are not binding upon the defenders.

Previous case weighting studies performed by TSG have yielded the caseload standards appearing on the following page. Since the case type categories studied were developed independently in each jurisdiction, the specific categories differ somewhat from jurisdiction to jurisdiction. King County, Washington; Maricopa County and Pima County, Arizona; and the State of Colorado are presented here.

Table V provides a summary of the caseload standards from those jurisdictions by equivalent case type, where possible. Please note that, as discussed throughout, direct comparisons between jurisdictions cannot take into account all of the different factors that influence the complexity of any particular case type. In some cases, the case type equivalents between jurisdictions are not exact. The existence of diversion and treatment courts, early disposition courts, and the severity of potential sentences and charging practices are unique to each jurisdiction and can substantially contribute to the differences between jurisdictions. Nonetheless, it is important to note that all of these caseload standards are *significantly* lower than the current situation in Missouri.

The caseload standards established in these other studies were conducted under circumstances where the offices had far more support staff resources than is the case in Missouri. In one jurisdiction, Pima County, the table presents standards that have been adjusted upward to ensure that the public defender is being utilized to their full potential.

[28]    Washington Defender Association Standards for Public Defense Services,
http://www.defensenet.org/resources/publications-1/wda-standards-for-indigent-defense

| TABLE V: Caseloads in Other Jurisdictions | | | | |
|---|---|---|---|---|
| Case Type | King County (2001) | Colorado (2002) | Maricopa County (2002) | Pima County (2002) |
| Available Attorney Work Hours | 1806 | 1808 | 1853 | 1845 |
| Felony Sex | A: 33.7 B: 61.2 | 32.6 | 31.9 | |
| Felony A (Class 2) | Repeat Offender: 8.5 Other: 24.5 | 32.6 | 76.5 | Mandatory sentence: 41.9 Other: 135 |
| Felony B (Class 3) | Repeat Offender: 16.5 Other: 65-96 | 105.5 | | |
| Felony C & D (Class 4-5) | Class C* Person: 74.2 | 200.2 | 313.6 | Mandatory & Fel. DUI: 103.1 |
| Felony E (Class 6) | Property: 88.4 Drug: 727.1** | 386.2 | | Non-Mandatory & Simple Possession: 204.9 |
| All Felony**** | 99.0 | 135.9 | 177.5 | 106.5 |
| Gross Misdemeanor | 235.8 | 196.4 | | |
| Other Misdemeanor | 371.4 | 429.8*** | | |
| All Misdemeanor**** | 249.4 | 291.8 | | 201.9 |
| All Juvenile | 203.5 | 248.7 | Fel: 149.5 Mis: 275.9 | 203.2 204.6 |

* the lowest level Felony in Washington State is a Class C Felony, and consists of Personal, Property and Drug Offenses.
** Felony C Drug Court. This is not a diversion court, but a court that handles only drug-related offenses.
*** Includes non-jailable misdemeanor traffic offenses
****The aggregate numbers in these categories are not caseload standards and should not be used in place of standards developed for the more specific case types for determining staffing needs. They are only presented to provide a rough comparison between jurisdictions, and will change as the ratio between more serious and less serious case types fluctuate.

The MSPD has been struggling with the development of an adequate caseload standard for many years. The Public Defender Commission found in 2005 that "excessive caseloads can and do prevent Missouri State Public Defenders from fulfilling the statutory requirements [for representation] and their ethical obligations and responsibilities as lawyers."[29]

---
[29] Missouri State Public Defender Commission's Findings and Directive on Caseload Standards in Accordance With Professional and Statutory Obligations, Finding 9 (adopted June 10, 2005) (draft copy).

51
130

Adding to the burden on the Public Defender system is the method by which conflicts are handled. Conflict cases are often transferred to an attorney in another MSPD office. This often involves a significant amount of travel time, and would further decrease the number of cases an office is able to handle.

Before any caseload standards can be established to provide a reasonable formula for projecting adequate attorney staffing needs, or to provide a maximum caseload number above which public defender offices should start to decline representation, a substantial increase in support staff resources must be in place. While the internal case weighting study performed by the MSPD may provide some insight to the relative complexity of different case types, the final results of the study and the subsequent time sufficiency survey, combined with our efforts to adjust those results to provide workable caseload standards, lead to some inescapable conclusions:

A. MSPD requires an increase in the number of support staff and investigative resources of at least 50 percent before a case weighting study would be able to provide a measure of attorney representation in a functioning indigent defense system.

B. MSPD attorneys, even if they had sufficient support staff and investigative resources, are disposing of cases at a rate far greater than the NAC recommended maximum caseload standards and well in excess of any jurisdiction in which TSG case weighting studies have established caseload standards. This has been the case for many years, with virtually no increase in attorney positions and an ever-increasing number of cases being appointed.

C. MSPD, in its efforts to control workload and to provide effective representation, has been turning away cases by performing triage, and turning away defendants who have managed to raise enough capital to post bond. *See infra* at 53-60. This results in the case weighting study having measured the amount of time it takes to provide

52
131

representation only in those cases selected by the public defender, and not in the universe of cases in which representation *should* be provided.

D. The failure of the legislature to provide relief to MSPD and the failure of the judiciary to question the practices which allow defendants to be refused representation for so many years have exacerbated the crisis. While MSPD has continued to press for funding increases, it has been forced to take steps to reduce the burden on its own attorneys, effectively denying representation to those who are constitutionally eligible.

## C. INDIGENCY DETERMINATIONS

The June 2009 site visits provided significant new information, particularly in the context of indigency determinations. This information appears to support a hypothesis first developed in 2005, namely that MSPD was declining to represent individuals who were deemed "not indigent enough" based on an informal, arguably expanded definition of indigency. What we did not anticipate in 2005, but was reported to us in 2009—and subsequently validated with data from updated MSPD figures—was the breadth of the problem, at least as it presently stands.[30] It now appears that, as each and every effort made to stem the tide of the caseload crisis failed, indigency determinations became a backdoor method of case disposal.

This situation is reflective of the larger principle that "lawyers have as their primary obligation the responsibility to represent the interest of *current* clients." Eight Guidelines at 16 (emphasis added). To avoid being forced to choose between existing clients and new clients, it makes sense that public defenders and their staff, when determining indigency, would tend to err on the side of exclusion in indigency determinations. We argued this very point in 2005, stating that indigency determinations by MSPD, rather than an independent, disinterested agency, create

---
[30] At this juncture we are unable to determine whether this was the case in 2005 as well, or whether the situation has changed over time.

53
132

a conflict of interest or at the very least an appearance of conflict. In 2009, it seems clear that there is more than an appearance of conflict, but indeed an actual conflict, which has had significant ramifications in terms of indigent defendants' right to counsel in Missouri.

*Statutes, Rules & Guidelines Relating to Indigency Determinations by MSPD*

Section 600.086 of the Missouri Revised Statutes states that "[a] person shall be considered eligible for representation under sections 600.011 to 600.048 and 600.086 to 600.096 when it appears from all the circumstances of the case including his ability to make bond, his income and the number of persons dependent on him for support that the person does not have the means at his disposal or available to him to obtain counsel in his behalf and is indigent as hereafter defined."[31] Pursuant to the statute, the MSPD is responsible for making indigency determinations. 600.082, RSMo. The statute also permits "the commission [to] establish and enforce such further rules for courts and defenders in determining indigency as may be necessary."

The statute regarding eligibility for representation states that the ability of a defendant to make a bond is a *circumstance* to be considered in making the determination, but not a bright-line rule.[32] Prior to 2006, however, pursuant to its statutory authority, the Public Defender Commission had established Guidelines for Determination of Indigence (hereinafter "GDI") which included an explicit "presumption" that a defendant was ineligible for the appointment of a public defender if released on a bail of $5,000 or more.[33] In our 2005 study, we concluded that

---

[31]   We have previously noted the peculiar and problematic nature of the statutory scheme. *See* 2005 study at 18-19 & n.28 ("Unlike most states, Missouri judges do not have the inherent authority to appoint counsel in the interests of justice unless a defendant has completed and signed an application and the Public Defender has determined the defendant to be indigent. This has created some tension between the Public Defender, who is concerned about high caseloads and limited resources, and the judges who are concerned about the efficiency of the courts.").

[32]   Missouri Revised Statute 600.086.1.

[33]   18 C.S.R. 10-3.010(2)(B)/(2) (2005).

54

133

---

The 2006 revisions to the GDI served to increase discretion while, decreasing transparency in indigency determinations, by eliminating the presumptions that attached to particular sums, leaving the MSPD free "to consider" these factors in making its determinations.[35]

*MSPD Indigency Determinations in Practice*

As discussed above, the June 2009 site visits provided valuable information about the reality of indigency standards and determinations, as they exist at present in Missouri. These data supported the conclusion that MSPD's role in making indigency determinations is not only inherently problematic, but leads to deeply troubling consequences, including what appear to be repeated denials of counsel to indigent criminal defendants.

Our 2005 hypothesis that many defendants should have been found indigent but were not was met with ample support from the individuals we interviewed in 2009. In fact, we were told that MSPD is "turning a lot more people away today than we ever did," so much so that "probably 4-5 people are turned away every day whereas before it was 2 or so people." Nor are the defendants being turned away exclusively misdemeanants; interviewees noted that MSPD was "turning away more people in felonies and misdemeanors." The explanation provided for the dramatic increase in indigent defendants being turned away by the public defender was simple: "The caseloads are such that we are turning a bunch of people away."

Of particular concern was the repeated reporting that the old "presumptions" (which were removed from the Guidelines three years ago) are not only still being applied, but are being enforced more strictly than ever. The Guidelines were explained to us as follows: "If you can afford a $500 bond, you don't get a PD—*that's in the Guidelines*. It's the amount you actually post, if it's a 10% bail, you only pay $50 then you can still get a PD, but if you have a

---

[35]   Language added in 2008 established an absolute bar to representation by MSPD if private counsel has been retained "at any time during the pendency of [a] case," such that "[t]he public defender shall not be available to assume representation" where private counsel withdraws. 18 C.S.R. 10-2.010(2) (2009).

56

135

---

both the "indigency presumption" and the role of MSPD in determining indigency appeared, at the outset, problematic.

Following that report, in 2006, the Commission changed the language—striking the following language creating a presumption of ineligibility based on the ability to make bond:

> Bond-If the defendant has been released on bail on any case in the amount of five thousand dollars ($5,000) or more, a presumption is created that the defendant is not indigent and the ability of the defendant to meet the bail must be given consideration[.]

The post-2006 Guidelines likewise changed the language regarding mortgages and assets, striking the mortgage subheading altogether, and modifying the language regarding assets so that no specific amounts are included. The following language was not included in the 2006 (present) version:

> Mortgage-If the defendant owns or is buying a home, the defendant's equity must be determined. If defendant's equity exceeds ten thousand dollars ($10,000), the defendant would not qualify for a public defender; and
>
> Assets-Unless the defendant is charged with a Class A felony, cash in excess of one thousand dollars ($1,000) creates a presumption of non-indigency. Bank accounts, stocks, bonds, jewelry, equity in insurance and any other financial assets must be considered. All vehicles are assets and must also be considered. If the total value of the asset(s) is more than two thousand dollars ($2,000), the defendant is presumed not to be indigent.[34]

The language on assets was substantially simplified and generalized, subsuming the discussion of equity in a home, such that now the standard is as follows: "If the person owns or is buying a home, the equity must be determined and considered on the question of indigence. Bank accounts, stocks, bonds, jewelry, equity in insurance and any other financial assets must be considered." 18 CSR 10-3.010 (2009).

---

[34]   18 C.S.R. 10-3.010(2)(B)(5)-(6) (2005).

55

134

---

$5000 bond, and you pay $500, you don't qualify." It was also reported that it is not uncommon for individuals to collect as much money as possible from family and friends in order to make bail, for example gathering together $500. What those individuals don't realize, we were told, is that once they use that money to make bail, they will then be deprived the services of the public defender, even if (as is often the case) there is no well left to tap. One investigator charged with conducting bond interviews two days each week, reported that "any [income] over $100 a week can kick [out] a person" sharing his view that, "the guidelines are ridiculous. You can make minimum wage and not get a PD." MSPD staff reported that "We've had 18 year olds who work at Taco Bell (even if they make $150) [who] need to hire a private attorney."

These reports strongly suggest that there is an entire category of indigent defendants who collect all the assets they will be able to amass for their defense at the outset of their cases, in order to get out of jail, and who—because they have done that—are deemed ineligible for the public defender. This catch-22 (in which indigents are essentially told to choose between custody and counsel), moreover, is said to be the direct result of MSPD's overwhelming caseloads. In the words of one MSPD reporter, "It's sad that we have to turn people away, but we have to pick and choose." Nor does this appear to be a new phenomenon, given the relatively longstanding application of presumptions against indigency, with special emphasis on the ability to make bond.

Data indicate that, on average, public defenders are finding between 8 and 9 percent of applicants ineligible. But these numbers belie tremendous variation in the various districts, where the reported refusal rate is as high as 48 percent. Indeed, the refusal rates in the districts of St. Charles, Fulton, Sedalia, Union, and Hillsboro all exceed 20 percent. TSG's analysis shows that between 2005 and 2008, MSPD represented between 55% and 59% of defendants charged with felonies in the state of Missouri, a number far lower than the 75%-85% that we have seen in most other jurisdictions. More surprising still is that the MSPD represented only

57

136    135

35% of the juvenile delinquency and status offense cases filed in Missouri courts in 2007, down from 40% in 2004, 38% in 2005, and 37% in 2006. Juvenile cases make up just about 4% of the appointments accepted by the MSPD, a number far lower that what would be expected. Whether these low rates reflect a deliberate decision of the MSPD or instead are representative of a system in which potential clients do not seek the services of a public defender even when they are eligible, the results are the same: an already overburdened MSPD is not serving potential clients. This is particularly troubling in the case of juveniles, who must rely upon others to obtain their counsel. Indeed, we are deeply concerned by the few juvenile cases being handled by the MSPD, which appears remarkably low and for which we have been unable to determine an immediate cause. This question merits further investigation and serious scrutiny.

The MSPD's pattern and practice or representation in 2009 bears out TSG's 2005 prediction, namely that using the public defenders to make indigency determinations creates at the very least an appearance of a conflict of interest. Public defenders, particularly when faced with crushing caseloads, have an incentive (however dedicated and well-meaning they may be) not to find defendants indigent. Reports from the site visit provide significant support for this conclusion, painting the picture of guidelines which, as implemented, amount to a presumption *against* indigency wherever possible. Despite the statutory requirements, we would restate our position that the Public Defender should not be responsible for indigency determinations. Few statewide public defender programs remain responsible for that task. The role creates, at the least, an appearance of a conflict if not an actual conflict.

It now appears clear that MSPD's indigency determinations have resulted in the wrongful denial of counsel to a substantial class of indigent persons. This suggests that, in addition to Missouri's obvious indigent defense crisis, there exists another quiet constitutional crisis that has never been addressed.

137 [58]

138

It is, of course, the caseload crisis that is driving the sweeping determinations of non-indigency we discovered in 2009. As we understand it, those determinations are often made by investigators and administrative staff rather than by attorneys. It seems fairly clear, then, that those on the ground are taking their marching orders from those at the top. Members of management conveyed to us, explicitly, that faced with a choice between clients to whom they have immediate duties and responsibilities, and indigent persons in the community who are entitled to a lawyer, there really is no choice; one's duty is to one's existing client. The rationale was explained as follows: Given the magnitude of the caseload crisis, resources are so scarce and attorneys so overworked that the addition of new clients must, of necessity, jeopardize the quality of representation that existing clients receive.

What results is a system wherein prospective clients are "kicked out" based on strictly enforced guidelines (including guidelines that are no longer in effect). In this system, a defendant may, for instance, cobble together what funds he can from friends and family in order to make bail, not knowing that he is actually facing a Hobson's choice between custody and counsel. The fact that he has made bail will almost certainly be used against him later, even though his friends and family may have nothing more to contribute. Once turned away by the Public Defender, he may wish he had just stayed in jail.

It seems clear that at the heart of both the MSPD Rule and SB 37, however well-meaning, was the same "case-dumping" impulse. In some ways resigned to the fact that they would never be properly resourced, management's goal was to rid the office of cases, through legislation which would create caseload caps, in the hope that it would be better able to put MSPD's limited resources toward the cases of existing clients, rather than spreading the agency more and more thinly.

The Governor is due credit for his recognition, in the face of legislation that passed by overwhelming majorities of both chambers of the Legislature, that this kind of solution, which

138 [59]

---

aimed to solve the problem by pushing cases out of the public system and onto the private bar, was no solution at all. What the Governor recognized is that "getting rid of" MSPD cases does not mean that those cases go away. The cases of poor people turned away by the Public Defender—whether by a caseload cap ceiling or an indigency determination floor—do not vanish into thin air. Throughout the years some have responded that the private bar is the solution, that they can, in effect, pick up the slack. But that approach is both impractical and incompatible with the requirement that the State provide representation to indigent persons facing criminal charges; the State may not wash its hands of its obligations by seeking to transfer those obligations to the private bar.[36]

**Section III. Assessment of Findings in Light of the Eight Guidelines**

Our findings regarding the systemic inability to comply with fundamental obligations, explored above, fully comport with the governing principle contained in the first guideline of the ABA's Eight Guidelines, namely that when "defense lawyers fail to discharge the kinds of fundamental obligations contained [herein], it is frequently because they have excessive workloads." The conclusion that MSPD's workloads are excessive is supported, moreover, by the data. The Eight Guidelines also provide us with substantial guidance in assessing not only the crisis situation that Missouri is confronting (and has long confronted), but also give us a metric by which to measure their response to that crisis.

Of course, it must be noted at the outset that the MSPD did not have the benefit of these guidelines during the first roughly fifteen years of its campaign for reform. Rather, the MSPD was left on its own to try and conceive an approach to a problem of remarkable breadth and

depth. MSPD did just that, developing a unified strategy that was state-wide, one which sought to address, *inter alia*, the legislature, the executive, the judiciary, and the public.

Considering their efforts in light of the Eight Guidelines, an evaluation that is retrospective by necessity, the MSPD has more than satisfied the steps proposed by the Eight Guidelines. Management was remarkably quick to recognize that the goals of the first four guidelines were not being satisfied. Although supervisors do not have the time to closely manage each case, by all accounts the situation was so dire that it did not require detailed case-by-case consideration; the sheer volume of cases combined with the generally overwhelmed response of attorneys and staff made it clear that neither reasonable workloads nor quality representation were likely to be achieved.

To the extent that it could, MSPD satisfied Guideline 5, which proposes examples of initial steps that can be taken when confronted with a caseload crisis. Guideline 5 recommends that

> Public Defense Providers consider taking prompt actions such as the following to avoid workloads that either are or are about to become excessive:
> - Providing additional resources to assist the affected lawyers;
> - Curtailing new case assignments to the affected lawyers;
> - Reassigning cases to different lawyers within the defense program, with court approval, if necessary;
> - Arranging for some cases to be assigned to private lawyers in return for reasonable compensation for their services;
> - Urging prosecutors not to initiate criminal prosecutions when civil remedies are adequate to address conduct and public safety does not require prosecution;
> - Seeking emergency resources to deal with excessive workloads or exemptions from funding restrictions;
> - Negotiating formal and informal arrangements with courts or other appointing authorities respecting case assignments; and
> - Notifying courts or other appointing authorities that the Provider is unavailable to accept additional appointments.

---

[36]  *See* "Justice Denied," Report of the National Right to Counsel Committee, 31 n.67 (Apr. 2009); *see also* ABA Model Rules of Professional Conduct, R. 6.1 (2007). Additionally, transferring a large volume of cases to the private bar is problematic for the following reasons: (1) Members of the private bar may lack the specialized training required to effectively handle a criminal case; and (2) it is probably more expensive.

139 [60]

140 [61]

Eight Guidelines at 12. The challenge that the MSPD faced, of course, particularly in light of the first three recommendations under this Guideline, had to do with the fact that it had no "additional resources" to spread around; nor could it simply refuse assignments for certain lawyers or reassign cases to other lawyers—because as it repeatedly indicated, *all* of its lawyers were carrying excessive caseloads.

Though MSPD lacked additional resources to redistribute, what it did instead was to repeatedly institute internal cost-cutting measures to ensure that it was operating in the most cost-effective manner possible. These measures included, *inter alia*:

> ➤ Salary and promotion freezes (even as attorneys and staff were delivering pizzas and selling beer at sporting events to make ends meet);

> ➤ Hiring freezes;

> ➤ Closure of juvenile offices in St. Louis and Kansas City;

> ➤ Closure of the Alternative Sentencing Office in order to convert 8.5 FTE's to attorney positions;

> ➤ Encouraging attorneys to perform administrative tasks such as filing and answering telephones due to the lack of support staff;

> ➤ Cutting overtime for non-attorney staff;

> ➤ Continuing to use outdated technology, including aging copy machines and inadequate voicemail; and

> ➤ Cutting back on training (where training funds were diverted to pay for bar dues and computer lines, leading to the elimination of secretarial training, new employee orientation, and "specialty" training, such as juvenile, capital and appellate training).

In 2007, the legislature provided $1.15 million specifically for contract cases in an effort to provide lawyers relief. But as Director Robinson explained, in Missouri, "It's actually a step backward," because the MSPD is far more cost-effective at handling cases, and it received nothing, even though it needed approximately ten times more than that which was allotted to contract cases.

14¢

on all fronts, including a substantial legislative effort cut short by executive veto—a campaign that has resulted in next to nothing. MSPD, to its great credit, has placed itself, for the good of its clients, "in an extremely awkward situation since on the one hand those in charge of the defense program have made clear that, in their professional judgment, caseloads are excessive and the lawyers providing direct client services are being forced to violate their ethical responsibilities, yet relief is unavailable." Eight Guidelines at 20. At this stage, there seems no room to doubt that as a consequence of a caseload crisis that has been essentially ignored for well over a decade,

> Defense lawyers are constantly forced to violate their oath as attorneys because their caseloads make it impossible for them to practice law as they are required to do according to the profession's rules. They cannot interview their clients properly, effectively seek their pre-trial release, file appropriate motions, adequately prepare for hearings and perform countless other tasks that normally would be undertaken by a lawyer with sufficient time and resources. Yes, the clients have lawyers, but lawyers with crushing caseloads who, through no fault of their own, provide second rate legal services simply because it is not humanly possible for them to do otherwise.

Eight Guidelines at 23.

**Section IV. Conclusion**

*Caseload Crisis*

Our findings lead to the inescapable conclusion that MSPD is confronting an overwhelming caseload crisis, one of the worst of its kind in the nation—a crisis so serious that it has pushed the entire criminal justice system in Missouri to the brink of collapse. The severity of this crisis has been forecasted for years, by those closest to it, but next to nothing has been done. And now the situation is as urgent as it is dire.

Haunting reports from attorneys and staff tell of lawyers whose greatest achievement at times is just showing up; when they arrive, however, they are grossly unprepared, lacking the research, the investigation, and the contact necessary to separate mere presence from

We were not able to obtain much information in our 2009 visit about potential efforts to reclassify minor misdemeanors, though this was a recommendation in our 2005 report. We agree with the ABA that this option is worth pursuing. However, the scope of the problem in Missouri is such that this approach could in no way be considered a total "fix."

MSPD has pursued resources as consistently and aggressively as any other public defender we have seen, and yet it remains 49th in the nation among statewide systems. It has attempted to notify courts that it is unavailable, in many cases, to take appointments. The lower courts appear to have deferred to the Supreme Court (as a court with some power over policy), and the Legislature. In sum, Guideline 5, which represents the public defender's efforts to make internal changes as well as seeking relief externally, has been more than satisfied by MSPD's efforts over the years.

Guidelines 6, 7, and 8 have likewise been satisfied by MSPD's efforts to declare particular offices "unavailable" for the assignment of cases. MSPD decided to seek relief from appointment in lieu of withdrawal consistent with the ethical obligations to existing clients, and the principle recognized by the Eight Guidelines that it is generally better to prevent appointment than to seek withdrawal.[37] Nor did MSPD rest when the trial court refused to cease appointing particular cases. As proposed by Guideline 8, the MSPD continued the decision, while "continu[ing] to provide representation." Eight Guidelines at 20. One step not yet taken by MSPD, but urged by the Guidelines "[w]hen alternative options . . . are exhausted, insufficient, or unavailable," is to enlist the help of a private law firm to pursue civil litigation on a pro bono basis. Eight Guidelines at 17.

In sum, although the ABA's Guidelines are just that, guidelines, MSPD has gone above and beyond the suggestions they provide—mounting a unified, organized, long-term campaign

---

[37]   *See* Eight Guidelines at 16 ("Because lawyers have as their primary obligation the responsibility to represent the interests of current clients, withdrawals from representation [are] less preferable than seeking to halt the assignment of new appointments.").

142
63

effective representation. In addition to their lack of preparation—a deficiency that at this point is structural—these lawyers are often weary, both physically and, as some have described, spiritually. They work so hard for so little, and yet they are often embarrassed by the work they manage to do, particularly when they must confront, time and again, the panic, frustration and disappointment of their clients. As the astonishing turnover rates over the years have demonstrated, most attorneys placed in this untenable position burn out—reaching a point where they can take it no longer.

We feel compelled to recognize, however, the courage displayed by those MSPD attorneys who forge ahead, out of a deep commitment to the well-being of their clients, as well as a strong belief that an adversarial legal system requires meaningful lawyering on both sides to be just. These lawyers work, to their great credit, in conditions that would drive (indeed, have driven) many of the most dedicated away. Director Robinson may have put it best when he said that the public defenders are "doing the best they can in their absolutely heroic efforts in what they're doing. The fact is they do good work, but they have too much work to do." The stories these defenders shared with us, which reflected a remarkable combination of candor, humility, and genuine personal concern for the poor people they serve on a daily basis, speak volumes about the caliber of people MSPD is lucky enough to employ. They, in so many ways, reflect the very best of the bar.

But bravery will not buy groceries for an attorney's family, and a dedication to justice cannot create more hours in the day for a Lexis search. The caseload crisis—which has spiraled out of control even with the use of inappropriate and overbroad determinations of non-indigency—has placed MSPD's attorneys in the cruelest of positions, one in which they are virtually guaranteed to fail, despite efforts that could fairly be described as heroic.

*The Tipping Point*

Earlier this year, the tragic crash of a commuter plane in Buffalo, New York sent chills across the country. The investigation that followed revealed that the pilots were underpaid, overworked, and that a combination of fatigue and poor training likely contributed to the accident. People across the country expressed their outrage that commuter pilots were paid so much less than pilots for major carriers, noting that one of the co-pilots had been forced to live at home with her parents because she could not afford to live on her own. Many concluded that the great tragedy of this event was that it was entirely predictable, and therefore preventable.

For close to a decade, MSPD has received no substantial increase in appropriations, despite the fact that year-by-year, MSPD has submitted budgets demonstrating that it is seriously under-funded and overloaded with cases. All three branches of government are on notice that Missouri has been operating a constitutionally inadequate system for some time now. MSPD has gone to the trial courts, to the courts of appeal, to the legislature, and to the governor. Yet the situation remains the same.

And so each day in Missouri, the State places the lives of poor citizens into the hands of attorneys who are underpaid, overworked, and badly supervised. We are not the first to say that Missouri's criminal justice system is heading for disaster, one which is both predictable and preventable. Missouri's public defender system stands at the bottom of its sister states in terms of resources, and the results are alarming. Missouri's public defender system has reached a point where what it provides is often nothing more than the illusion of a lawyer. There is nothing more dangerous in the criminal justice system than the illusion of a lawyer.